# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

CAROL H. WARREN, individually, and as
the personal representative of the Estate of
Robert A. Warren,

> Plaintiff,

vs.                                                                    No. CIV 15-0654 JB/SCY

UNITED STATES OF AMERICA,

> Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the Defendant's Motion to Dismiss for

Lack of Jurisdiction and Memorandum in Support, filed February 9, 2016 (Doc. 14)("MTD");

and (ii) Plaintiff Carol Warren's Joint Response to the United States' *Motion to Dismiss for Lack*

*of Jurisdiction and Memorandum in Support* (Doc. 14) and Motion for Leave to Amend the

Complaint, filed August 16, 2016 (Doc. 33)("Motion to Amend").  The Court held a hearing on

February 22, 2017.  The primary issues are: (i) whether Plaintiff Carol Warren has stated a claim

over which the Court has jurisdiction, in light of the potential application of the discretionary

function exception to the Defendant United States of America's limited waiver of sovereign

immunity under the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680 ("FTCA"), where C.

Warren has alleged negligence on the part of Bureau of Prisons ("BOP") officials for the death of

her husband, Robert Warren, who was attacked and killed at a BOP facility; and (ii) if the Court

should allow C. Warren to amend her First Amended Complaint, filed September 30, 2015 (Doc.

4)("First Amended Complaint"), to include more specific allegations that assert the existence of

mandatory directives regulating Bureau of Prisons officials' conduct, thereby limiting and

removing their discretion in relevant part.  Because the Court concludes that C. Warren's First Amended Complaint fails to make the requisite allegations establishing that the discretionary function exception does not bar the Court's jurisdiction over her claims, and that the proposed Second Amended Complaint, filed August 16, 2016 (Doc. 33-2)("Second Amended Complaint"), attached to her Motion to Amend, similarly fails to cure the First Amended Complaint's deficiencies, making leave to amend futile, the Court will grant the MTD and deny the Motion to Amend, thereby dismissing the First Amended Complaint without prejudice for lack of jurisdiction.

## FACTUAL BACKGROUND

The Court takes its following recitation of the facts from C. Warren's First Amended Complaint and proposed Second Amended Complaint.  The Court does not set forth these facts as findings or the truth, and considers them only in the context of the MTD.  The Court recognizes that the factual background is, necessarily, largely Warren's version of events.

Defendant United States is responsible for managing and operating the federal correctional facility at Victorville, as well as the "Regional Designation Center, located in Grand Prairie, Texas."  First Amended Complaint ¶ 4, at 2.  C. Warren asserts that "the acts and conduct alleged herein were performed by agents and employees of the United States acting in the course and scope of their employment and with the knowledge and consent of their employer, the United States."  First Amended Complaint ¶ 5, at 2.  R. Warren was "a 72-year old retired Wall Street attorney, university instructor, philanthropist, and author," who had moved with his wife C. Warren to Santa Fe, New Mexico, from New York, in 1991.  First Amended Complaint ¶¶ 8-14, at 3.  During his time in Santa Fe, R. Warren pursued a variety of academic, philanthropic, and cultural hobbies.  See First Amended Complaint ¶¶ 15-25, at 3-5.  R. Warren

also "began to experience minor episodes of confusion, memory loss, and aberrant behavior," First Amended Complaint ¶ 21, at 4, and "was diagnosed with mild peripheral neuropathy and neurocognitive impairment," First Amended Complaint ¶ 22, at 4. According to a psychologist's subsequent medical evaluation of R. Warren, his tendency for preoccupation and abnormal intensity and focus was "attributable to Asperger's Syndrome." First Amended Complaint ¶ 26, at 5.

Following his diagnosis, R. Warren began to spend an "inordinate amount of time on the internet," First Amended Complaint ¶ 27, at 5, and "became excessively involved in viewing internet pornography," First Amended Complaint ¶ 28, at 5. "Eventually, Mr. Warren began to view and download child pornography, an offense for which he was arrested in July 2009." First Amended Complaint ¶ 29, at 5. After his arrest, R. Warren underwent further medical evaluations, resulting in the discovery of "a cystic formation in the left frontal lobe of his brain, the area of the brain responsible for an individual's ability to reason," First Amended Complaint ¶ 32, at 5, and a reconfirmed diagnosis of "Asperger's Syndrome, an Autism Spectrum Disorder characterized by a right hemisphere brain disorder," First Amended Complaint ¶ 33, at 6. R. Warren "relied on a cane to walk due to right leg weakness," First Amended Complaint ¶ 37, at 6, and "had a history of transient ischemic attacks, for which he took daily medication to reduce his risk of stroke," First Amended Complaint ¶ 38, at 6.

R. Warren pled guilty to a "single count of receipt of a visual depiction of minors engaged in sexually explicit conduct, in violation of 18 U.S.C. § 2252(a)(2)," on August 30, 2010. First Amended Complaint ¶ 39, at 6. The Honorable Bruce Black, United States District Judge for the District of New Mexico, sentenced R. Warren to a mandatory minimum sentence of 60 months. See First Amended Complaint ¶ 40, at 7. Judge Black recommended to the BOP

that R. Warren be "housed in one of two medical facilities for federal inmates with special health needs and sex-offender treatment programs: The Federal Medical Center, Butner (FMC Butner), in Butner, North Carolina; or the Federal Medical Center, Devens (FMC Devens), in Devens, Massachusetts." First Amended Complaint ¶ 41, at 7. The BOP, however, "elected to house R. Warren . . . with young, violent offenders convicted of armed robbery, homicide, and other violent offenses at the F.C.I. Victorville Medium II . . . a medium-security federal correctional facility in Victorville, California." First Amended Complaint ¶ 44, at 7. At the Victorville facility there are three federal correctional facilities, two medium-security prisons -- Victorville Medium I and Victorville Medium II, and the high security United States Penitentiary, Victorville, which houses high-security male inmates. See First Amended Complaint ¶ 45, at 7.

> Accordingly, the First Amended Complaint alleges:

> By assigning Mr. Warren to serve a sentence of incarceration with hardened, violent criminals at Victorville II, the United States breached a duty of care owed to Mr. Warren under 18 U.S.C. § 4042(a), which mandated that the United States provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States; and provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States.

First Amended Complaint ¶ 46, at 8 (internal quotation marks omitted). The First Amended Complaint explains that "[d]esignation of an inmate to a specific institution is governed by [BOP] Program Statement []5100.08, entitled Inmate Security Designation and Custody Classification," First Amended Complaint ¶ 47, at 8 (internal quotation marks omitted), and that the BOP is thus instructed that "[t]he classification of inmates is necessary to place each inmate in the most appropriate security level institution that also meets their program needs and is consistent with the Bureau's mission to protect society," First Amended Complaint ¶ 48, at 8. Thus, BOP institutions are "classified into one of five security levels: minimum, low, medium,

high, or administrative, based on the level of security and staff supervision the institution is able
to provide." First Amended Complaint ¶ 49, at 8. BOP inmates, consequently, are also
classified "based on the primary considerations of (1) the level of security and supervision the
inmate requires; and (2) the inmate's program needs (including medical and/or mental health
treatment and counseling)," First Amended Complaint ¶ 50, at 8, and are given an "inmate's
security score" as generated by an individual inmate's comparison to an objective set of factors,
First Amended Complaint ¶ 58, at 9-10. R. Warren was given a security score of six, "which is
in the lowest point range possible," First Amended Complaint ¶ 60, at 10, and was thus
designated as having a "security level of low," First Amended Complaint ¶ 61, at 10. According
to the First Amended Complaint, "[i]n order to designate Mr. Warren to a facility that was
inconsistent with his scored security level of 'low,' the Designator was required to apply a
Management Variable to override Mr. Warren's designation to a low-security facility." First
Amended Complaint ¶ 62, at 10. Management variables are applied, because "[s]ituations may
occur in which an inmate requires housing in a facility which is not commensurate with his or
her security level. Following are example situations: facility activation; population pressures
affecting available appropriate-level bed space within 500 miles of the inmate's anticipated
release residence; gang/security concerns." First Amended Complaint ¶ 72, at 11. The
Management Variable applied in R. Warren's case to authorize his housing in medium-security
at Victorville II was "Population Management." First Amended Complaint ¶¶ 63-71, at 10-11.

After R. Warren's designation, he arrived at the medium security Victorville II facility on
June 9, 2011. See First Amended Complaint ¶ 92, at 16. R. Warren's "Intake Screening Form
noted, under [his] comments, 'possess child pornography,'" First Amended Complaint ¶ 94, at
16 (alteration added), and also that he was "OK FOR GENERAL POPULATION," First

Amended Complaint ¶ 95, at 16.  Then, "on June 10, 2011, at approximately 7:15 a.m. while standing in a 'pill line' outside the medical office to obtain his daily medications, Mr. Warren was approached from behind by multiple younger inmates," First Amended Complaint ¶ 96, at 16, who proceeded to repeatedly punch and kick him, resulting in lacerations, bruises, and a hematoma to his right ear, see First Amended Complaint ¶¶ 97-105, at 16.  The attackers also allegedly told R. Warren to "stay away from little kids."  First Amended Complaint ¶ 106, at 17.  Following the attack, R. Warren "crawled to the door of the Special Housing Unit and pressed the emergency button to gain entry into that wing of the facility."  First Amended Complaint ¶ 119, at 18.  BOP staff subsequently moved R. Warren to solitary confinement.  See First Amended Complaint ¶ 121, at 18.

On July 1, 2011, after the attack, R. Warren's legal counsel inquired of the BOP Victorville II facility what "measures the facility was taking to protect" R, Warren, requested R. Warren's transfer, and expressed concern about the speed with which other inmates became aware of R. Warren's conviction's nature.  First Amended Complaint ¶¶ 123-24, at 19.  The Warden replied to R. Warren's counsel, and indicated that an investigation was ongoing and that R. Warren would remain in solitary confinement until it was complete.  See First Amended Complaint ¶¶ 126-29, at 19.  On August 19, 2011, the "investigation into Mr. Warren's June 10 assault was completed," and his assailants were not officially identified.  First Amended Complaint ¶ 132, at 20.  After the investigation, BOP officials concluded that R. Warren's safety was at risk at Victorville II "and recommended that Mr. Warren be transferred out of the facility."  First Amended Complaint ¶ 133, at 20.  R. Warren told C. Warren, at some point, that the inmates somehow had enough information about him to have researched his charges, that BOP staff had provided his full name to the other inmates, and that it was known that an inmate

named Frederick Ashley used Lexis Nexis services at the prison to identify incoming inmates with sex-offender status. See Second Amended Complaint ¶ 87, at 13; id. ¶ 110, at 17; id. ¶ 120, at 18.

In the meantime, Ashley was also housed in solitary confinement, because Ashley was receiving "punishment for assaulting a sex-offender inmate." First Amended Complaint ¶ 130, at 19. The First Amended Complaint explains that Ashley "was known to be a highly influential enforcer who controlled white inmates in Victorville II," First Amended Complaint ¶ 114, at 17, and who had "violently assaulted at least four inmates convicted of sexual offenses," First Amended Complaint ¶ 115, at 17. See Second Amended Complaint ¶¶ 115-126, at 18-19. BOP officials were, at the same time of R. Warren's investigation, in the process of "investigating whether Frederick Ashley should be transferred to a high-security facility because of the security threat he posed to inmate sex offenders in Victorville II." First Amended Complaint ¶ 135, at 20. Ultimately, "Ashley was recommended for transfer to a high security facility based on the threat he posed to the safety of inmate sex offenders at Victorville II . . . ." First Amended Complaint ¶ 139, at 21. As well, BOP allegedly mandated that Ashley be segregated from those to whom he posed risks, such as sex-offender status inmates. See Second Amended Complaint ¶ 126, at 19; id. ¶ 155, at 22; id. ¶¶ 272-73, at 45; id. ¶ 290, at 46.

On September 3, 2011, the BOP ordered "that Mr. Warren be separated from two influential white inmates at Victorville II," one of whom the First Amended Complaint states was Ashley, but the Second Amended Complaint then concedes was not Ashley. First Amended Complaint ¶¶ 140-45, at 21 (indicating, however, that the names were redacted on the copy of the paperwork possessed by C. Warren). See Second Amended Complaint at 22-23. On September 29, 2011, the Warden at Victorville submitted a formal transfer request for R.

Warren, because R. Warren had "received a Central Inmate Monitoring ["CIM"] assignment of separation from two influential white inmates who are currently in general population at FCI Victorville II. Therefore, it is recommended that inmate Warren be transferred to a facility that is commensurate with his safety and security requirements." First Amended Complaint ¶ 148, at 22. See Second Amended Complaint ¶¶ 143-44, at 25; id. ¶ 165, at 26; id. ¶ 176, at 43; id. ¶¶ 272-73, at 45; id. ¶ 283, at 46 (reiterating that BOP had in place an order that R. Warren remain segregated from certain inmates posing a threat to his safety, namely influential white inmates known to prey on inmate sex offenders). On October 31, 2011, the BOP designated R. Warren for transfer to "FCI Big Spring, a low-security facility in Big Spring, Texas." First Amended Complaint ¶ 154, at 23. "Around the same time, the BOP designated . . . Frederick Ashley to be transferred to the USP Hazelton, a high-security federal prison in West Virginia." First Amended Complaint ¶ 156, at 23. "Sometime in November of 2011, the BOP transferred Mr. Warren to a holdover unit at the neighboring high-security Victorville USP." First Amended Complaint ¶ 157, at 23. Ashley was then transferred to the same holdover unit, apparently prompting R. Warren's transfer to a different holdover unit before his departure from Victorville. See First Amended Complaint ¶¶ 158-59, at 23-24.

On December 28, 2011, R. Warren learned that "the names of the inmates to be transferred to new facilities by bus the following morning had just been 'read out' loud by BOP staff," information that he then relayed to C. Warren over the telephone. First Amended Complaint ¶¶ 158-59, at 23-24. On December 29, 2011, BOP staff took R. Warren from his cell in the holdover unit and prepared him for his transfer to Big Spring. See First Amended Complaint ¶ 165, at 24. R. Warren was then placed in a communal holding cell in the facility's receiving and discharging area -- or inmate transfer area -- with other transferring inmates, in

anticipation of their processing for transfer.  See First Amended Complaint ¶¶ 167-68, at 24.

Ashley was placed in the same communal holding cell as R. Warren.  See First Amended

Complaint ¶ 169, at 25.

Once BOP staff had departed from the communal holding cell, Ashley told the other

inmates: "You better look away and out the window, while I kill this motherfucker."  First

Amended Complaint ¶ 179, at 26.  "[T]he correctional officers at Victorville USP had so loosely

shackled Ashley's waist chain Ashley was able to lower the waist chain towards the floor and

step out of the restraint."  First Amended Complaint ¶ 181, at 26.  See Second Amended

Complaint ¶ 179, at 27; id. ¶ 322, at 41 (stating that the BOP failed to secure Ashley's waist

chain, in contravention of "BOP Program Statements, Institutional Supplements, and/or Post

Orders propounded by the institution").  Ashley then knocked Warren to the ground, and

"proceeded to choke and strangle Mr. Warren with the chain that was supposed to have been

tightly bound around Ashley's waist."  First Amended Complaint ¶ 181, at 26.  "Ashley

successfully strangled Mr. Warren to the point that his eyes began to swell and hemorrhage."

First Amended Complaint ¶ 187, at 27.  Ashley's force "splintered Mr. Warren's hyoid bone in

his throat," First Amended Complaint ¶ 191, at 27, and after several minutes of strangulation,

Ashley proceeded to stomp on R. Warren's skull, see First Amended Complaint ¶¶ 195-206, at

27-28.  R. Warren suffered numerous crush wounds, including one major deformity to the front

of his skull.  See First Amended Complaint ¶ 202, at 28.  Ashley also stomped down on R.

Warren's chest and upper torso, breaking his ribs, crushing his larynx, and causing numerous

other serious injuries.  See First Amended Complaint ¶¶ 206-211, at 28-29.  BOP staff then

discovered the scene and called in paramedics.  See First Amended Complaint ¶¶ 213-220, at 29;

Second Amended Complaint ¶ 187, at 28; id. ¶ 322, at 41 (alleging further that BOP failed to

attend the communal holding cell in contravention of "BOP Program Statements, Institutional Supplements, and/or Post orders").   The paramedics made various attempts to alleviate R. Warren's trauma, see First Amended Complaint ¶¶ 216-240, at 29-31, but when R. Warren arrived at the emergency room, approximately an hour after the attack had ended, he already "was in a state of asystole (flatline) without agonal complexes (slow ventricular rhythms)," First Amended Complaint ¶ 241, at 31.   R. Warren "was pronounced dead at 8:42 a.m. on December 29, 2011."   First Amended Complaint ¶ 249, at 32.   A pathologist concluded that E. Warren's "cause of death was asphyxia, hour, due to blunt force injuries of neck and head, hours."   First Amended Complaint ¶ 253, at 32.   C. Warren further asserts that BOP generally failed to comply with CIM separation assignments, BOP Program Statements, Institutional Supplements, and/or Post Orders in its failure to exercise reasonable care to ensure R. Warren's safety.   See Second Amended Complaint ¶ 293, at 38; ¶ 304, at 39; ¶ 314, at 40; ¶ 323, at 42.

## PROCEDURAL HISTORY

C. Warren filed the First Amended Complaint following the "brutal physical attack leading to the death of Mr. Warren by a known, hostile inmate at U.S.P. Victorville, a federal correctional facility located in Victorville, California," First Amended Complaint at 1, and following  C. Warren's original filing of the Complaint, filed July 27, 2015 (Doc. 1).  The First Amended Complaint seeks damages for wrongful death under the "statutory law of California," as well as "survival damages for negligence under the common and statutory law of California and Texas; survival damages for intentional torts (assault and battery), under the common law of California; and survival damages for violation of the Elder Abuse and Dependent Adult Civil Protection Act, Cal. Wel. & Inst. Code § 15600 . . . ."   First Amended Complaint at 1. According to the First Amended Complaint, the Court has jurisdiction under "28 U.S.C. § 1331

(Federal Question), § 1343 (Civil Rights) and § 1346(b) (United States as Defendant)." First Amended Complaint ¶ 1, at 2. Count 1 states "a survival action for negligence based on Defendant's failure to comply with mandatory requirements in designating Mr. Warren to a BOP institution that was commensurate with his security and program needs," First Amended Complaint ¶ 263, at 33-34, brought pursuant to the FTCA, and under a "Texas Survival Statute, Tex. Civ. Practice & Remedies Code § 71.021; and the common law of Texas," First Amended Complaint ¶ 264, at 34. Count 2 states "a survival action for negligence based on Defendant's wrongful conduct and/or negligence of Defendant in failing to protect Mr. Warren from a fatal attack while in Defendant's custody," First Amended Complaint ¶ 278, at 35, brought pursuant to the FTCA, and under "the California Survival Statutes, Cal. Code of Civ. Proc. §§ 377.20, 377.21, 377.30 et seq.; and California's negligence statute, Cal. Civ. Code § 1714," First Amended Complaint ¶ 279, at 36. Count 3 states a survival action "for Defendant's intentional infliction of emotional distress upon Mr. Warren," brought pursuant to the FTCA. First Amended Complaint ¶ 293, at 37. Count 4 states a survival action for "Defendant's recklessness in failing to exercise reasonable care in providing for Mr. Warren's safety, failing to comply with the . . . 'Keep-Away' order, and failing to otherwise protect Mr. Warren from an individual known to attack sex offenders like Mr. Warren," brought pursuant to the FTCA, and under "the California Elder Abuse and Dependent Adult Civil Protection Act . . . Cal. Welf. & Inst. Code §§ 15600 et seq." First Amended Complaint ¶ 304, at 38-39. Count 5 states a survival action for assault, brought pursuant to the FTCA, and under "the common law of California," First Amended Complaint ¶ 268, at 41, because the "Defendant, by and through its agents and officers, and using as its instrumentalities Mr. Warren's fellow inmates, intended to cause harmful or offensive contact, or the imminent apprehension of such contact, to Mr. Warren,"

First Amended Complaint ¶ 269, at 41.  Count 6 states a survival action for battery, brought pursuant to the FTCA, and under "the law of Texas and/or California," First Amended Complaint ¶ 280, at 42, because the "Defendant, by and through its agents and officers, and using as its instrumentalities Mr. Warren's fellow inmates, caused Mr. Warren to be touched with the intent to harm or offend him," First Amended Complaint ¶ 281, at 42.  Count 7 states an action, asserted by C. Warren individually, for wrongful death, brought pursuant to the FTCA, and under "the California Wrongful Death Statute (California Code of Civil Procedure §§ 377.60, 377.61, 377.62)," because "the wrongful death of Mr. Warren [] resulted from Defendant's wrongful conduct and/or negligence."  First Amended Complaint ¶ 289, at 43-44. The First Amended Complaint thus requests compensatory damages -- including survival and wrongful death damages -- in accordance with the aforementioned allegations.  See First Amended Complaint at 45.

### 1.     The MTD.

In lieu of filing an answer to the First Amended Complaint, the United States filed its MTD on February 9, 2016.  The MTD argues a lack of subject-matter jurisdiction, because C. Warren's claims "fall within the discretionary function exception to the Federal Tort Claims Act."  MTD at 1.  The MTD begins with a lengthy exposé regarding R. Warren's engagement with the child pornography leading to his conviction.  See MTD at 1-3.  The MTD then characterizes C. Warren's claims against the United States, arguing that C. Warren alleges that the United States has

> breached a duty of care owed to Mr. Warren under 18 U.S.C. § 4042(a) by housing Mr. Warren at the F.C.I. Victorville Medium II . . . a medium-security federal correctional facility . . . placing Mr. Warren in a communal holding cell pending his transfer to another facility . . . placing Ashley in the same holding cell . . . failing to fasten Ashley's waist chain tightly . . . and leaving the holding cell unattended. . . .  [and] these  actions violated 18 U.S.C. § 4042(a), the Bureau of

Prisons Program Statement P5100.08, entitled Inmate Security Designation and Custody Classification, and CIM Keep-Away order.

MTD at 3-4 (internal quotations omitted). Next, the MTD describes the limited waiver of sovereign immunity that the United States makes by the FTCA for "claims arising out of injuries caused by the negligence of governmental employees acting within the scope of their employment." MTD at 4 (citing the FTCA, 28 U.S.C. § 1346(b)(1)). According to the MTD, the FTCA does not, however, waive the United States' sovereign immunity from claims "'based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.'" MTD at 4 (quoting the FTCA, 28 U.S.C. § 2680(a)). The United States thus argues that this "discretionary function exception" applies without regard to whether the "discretion involved was abused or the product of negligence," and that its application is a "jurisdictional issue which precedes any negligence analysis." MTD at 4-5 (citing Elder v. United States, 312 F.3d 1172, 1176 (10th Cir. 2002); Johnson v. United States Dept. of Interior, 949 F.2d 332, 335 (10th Cir. 1991)). Accordingly, the United States maintains that C. Warren must prove more than negligence and must also "first prove that their claims are not based upon actions immunized from liability under the FTCA's discretionary function exception." MTD at 5. The relevant inquiry, then, the United States argues, is "not whether the agency was negligent, but rather what was the nature of the agency's decision." MTD at 7 (alterations omitted)(citing Johnson v. United States Dept. of Interior, 949 F.2d at 338).

Here, the United States argues, to determine whether the challenged BOP conduct falls within the discretionary function exception, the Court must apply the test in Berkovitz v. United States, 486 U.S. 531 (1988)("Berkovitz"). See MTD at 8. The United States provides that, under Berkovitz, step one inquires "whether the challenged conduct involves an element of

judgment or choice," or whether "a federal statute, regulation, or policy . . . specifically prescribes a course of action for an employee to follow."  MTD at 8.  Then, the United States provides, if judgment or choice is involved, step two inquires "whether that judgment is the kind that the discretionary function exception was designed to shield," i.e., a judgment with policy implications.  MTD at 8.

In applying the Berkovitz test to the challenged conduct at issue in this case, the United States first asserts that the "BOP's decisions on inmate placement are discretionary" and that "Congress has reserved considerable discretion for the agency in making decisions related to inmate placement."  MTD at 8.  After providing the relevant statutory frameworks authorizing the BOP's operations, the United States argues that every federal court to consider the issue has concluded that "neither statute sets forth a specific or mandatory course of action for BOP to follow.  Instead, they give the BOP ample room for judgment by listing a non-exhaustive set of factors for the BOP to consider . . . leaving to the BOP what weight to assign to any particular factor."  MTD at 9 (internal quotation marks omitted).  R. Warren's placement in any given prison, then, was, according to the United States, "clearly discretionary."  MTD at 9.

The United States then argues that C. Warren's reliance on the "BOP program Statement P5100.08, Inmate Security Designation and Custody Classification," is erroneous, because that Program Statement "vests the decision squarely within the discretion of the BOP," to apply certain management variables when the BOP is considering the placement of any particular inmate.  MTD at 10.  Thus, the United States maintains that "placing a management variable on an inmate is merely a discretionary step within the broader placement decision for that inmate, the decision whether to place a management variable on a particular inmate also falls within the discretionary function exception."  MTD at 10 (citing Lineberry v. United States, 2009 WL

763052, at *6 (N.D. Tex. 2009)(Fish, S.J.)).  Accordingly, in this case, the United States asserts that, although R. Warren was scored as a low-security inmate, the BOP's decision to further apply a management variable and house him at a medium-security facility was merely "an exercise of discretion authorized by both 18 U.S.C. § 3621(b), and Program Statement 5100.08." MTD at 10-11.

Regarding R. Warren's placement in the communal holding cell with Ashley, the United States similarly argues that C. Warren has failed to "identify a mandatory statute, rule, or policy that was violated" by the BOP.  MTD at 11.  The United States explains that C. Warren has alleged only that some "separation order dealing with Mr. Warren and two individuals whose names were redacted" exists, but, according to the United States' MTD, Ashley was not one of those individuals.  MTD at 11.  Thus, the United States argues that C. Warren is only second-guessing the BOP's discretionary designation decisions, which the discretionary function exception to the FTCA disallows.  See MTD at 12.  The United States further argues, in its MTD, that the "BOP's placement decisions enjoy a presumption of being grounded in public policy," because the "BOP's exercise of its statutorily conferred discretion allows staff to apply professional judgment to better ensure the safety of inmates and staff, and to protect the public." MTD at 12.

The United States next maintains that the "BOP's decisions on security of inmates are discretionary . . . [and] consigned to BOP's discretion by law."  MTD at 13.  According to the MTD, although

> [t]he mandate of the BOP is to provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States, or held as witnesses or otherwise . . . and to provide for the protection . . . of all persons charged with or convicted of offenses against the United States,

MTD at 13 (citing 18 U.S.C. § 4042(a)(2)-(3)), that mandate "does not, however, direct the manner by which the BOP must fulfill this duty," MTD at 13.  Indeed, the United States argues, "[t]he statute sets forth no particular conduct the BOP personnel should engage in or avoid while attempting to fulfill their duty to protect inmates."  MTD at 13.  Accordingly, the United States maintains that C. Warren "identifies no mandatory rule or policy that was violated with respect to prisoner restraint and supervision in the holding unit. . . .  BOP does not have a mandatory policy requiring constant, in-person supervision. . . .  BOP does not have a mandatory policy requiring restraint of prisoners in a holding cell."  MTD at 14.  Such reasoning, the United States suggests, underlies "countless judicial decisions [that] have, for similar reasons, refused to review BOP decisions regarding when, how, or whether to restrain or supervise inmates."  MTD at 14-15.

Thus, the United States emphasizes that, "[b]ecause Congress has consigned the protection of inmates to BOP by statute, courts will presume that BOP's decisions in that respect are grounded in policy."  MTD at 16.  Consequently, in this case, the United States asserts that the "BOP's decisions with respect to the level of prisoner restraint and supervision in the holding unit were susceptible to multiple, competing policies."  MTD at 16.  Such management of competing policies suggests mandatory exercise of discretion on the part of the BOP along every stage of R. Warren's detention.  See MTD at 16-17.  The MTD thus concludes by stating that the FTCA's discretionary function exception bars the First Amended Complaint's claims.  See MTD at 17.

### 2.    **The Motion to Amend.**

C. Warren responded to the MTD with her Motion to Amend, which doubles as both a responsive brief regarding the MTD and also a new motion seeking leave to amend the First

Amended Complaint in an effort to more completely allege grounds dispelling the application of

the FTCA's discretionary function exception.  <u>See</u> Motion to Amend at 1.

> The Motion to Amend begins by explaining that C. Warren
>
> filed her Complaint under the [FTCA], 28 U.S.C. § 1346(b) and 28 U.S.C. § 2671-2680, seeking damages from the United States of America for wrongful death, negligence, assault and battery, and violation of the Elder Abuse and Dependent Adult Civil Protection Act, Cal. Wel. & Inst. Code § 15600 et seq.

Motion to Amend at 1.  C. Warren then argues that the First Amended Complaint adequately

> identified multiple ways in which the Government's tortious conduct violated the FTCA, the federal statute which provides for claims for personal injury or wrongful death "caused by the negligent or wrongful act or omission" of any government employee acting within the scope of his employment "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

Motion to Amend at 2 (quoting 28 U.S.C. § 1346(b)(1)).  In particular, C. Warren highlights her

allegations that the United States failed to comply with mandatory requirements when it failed to

designate R. Warren to a BOP facility "commensurate with his low-security classification and

program needs," thereby putting him at unreasonable risk of harm given his sex-offender status,

age, and physical ability to defend himself, and that the United States failed to comply with a

CIM assignment of separation that mandated that R. Warren and -- upon C. Warren's

information and belief -- Ashley, be separated for R. Warren's safety.  Motion to Amend at 2.

According to C. Warren, the United States has supported its MTD, with respect to those

allegations, by arguing only that "the challenged conduct fell within the discretionary function

exception."  Motion to Amend at 3 (referencing the Affidavit of Eric Davis (executed February

4, 2016), filed February 9, 2016 (Doc. 14-1)("Davis Aff.")(involving the declaration of a

Correctional Systems Specialist who states that the BOP enjoys broad discretion when

designating inmates to particular facilities, as well as when supervising and monitoring those

inmates in their communal transport holding cells)).   Regarding those allegations, the Motion to Amend also concedes, however, that in the MTD, the United States has provided evidence that Ashley was not one of the two individuals who were subject to R. Warren's CIM assignment of separation.   See Motion to Amend at 3 (referencing R. Warren's CIM Separation Order (dated September 3, 2011), filed February 9, 2016 (Doc. 14-3)("CIM Separation Order")(listing, in addition to the fact that R. Warren cannot "safely reside in general population, specifically amongst white inmates," that he also requires separation from "inmates Beraldo . . . and Jerecki . . . .")).   C. Warren nonetheless also explains that the First Amended Complaint makes allegations that regard the BOP officials' lack of supervision of the communal holding cell, and the BOP officials' failure to adequately secure Ashley's waist restraints.   See Motion to Amend at 2 n.2. According to C. Warren, the United States has supported its MTD those allegations by attempting "to subsume this conduct into one generalized argument that BOP's decisions on security of inmates are discretionary."   Motion to Amend at 2 n.2 (internal quotation marks omitted).   Accordingly, C. Warren first explains that she now seeks an opportunity to obtain "limited discovery . . . as necessary to respond to the instant [MTD] and potentially seek leave to amend her [First Amended] Complaint."   Motion to Amend at 3.   She then subsequently argues that the Court should nonetheless deny the MTD, because the First Amended Complaint makes sufficient allegations under the FTCA, despite the discretionary function exception, see Motion to Amend at 7-10, and that her Motion to Amend should be granted -- if the Court agrees with the MTD's arguments -- to add additional "factual allegations -- many, of necessity, upon information and belief -- asserting how different categories of mandatory directives removed the element of choice from BOP officials' conduct in the placement of her husband in a holding cell with Ashley and in the securing of Ashley's shackles," Motion to Amend at 11.

After providing the legal standards for the Court's consideration of a MTD and a Motion to Amend, the Motion to Amend then explores the FTCA's discretionary function exception, arguing that the allegations here are not barred by the discretionary function exception's limit to the FTCA's waiver of federal-government immunity.  See Motion to Amend at 4-7.  According to C. Warren,

> Courts apply a two-pronged test to determine whether the discretionary function exception should adhere to governmental conduct.  First, a court considers whether the challenged conduct "involve[s] an element of judgment or choice and [is] not compelled by statute or regulation."  United States v. Gaubert, 499 U.S. 315, 325 (1988)[]("[t]he requirement of judgment or choice is not satisfied if a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow, because the employee has no rightful option but to adhere to the directive").  Second, if the challenged governmental conduct does involve an element of judgment, the court must consider whether "the judgment or choice in question [was] grounded in considerations of public policy or susceptible to policy analysis," as such judgments are of the kind that the discretionary function exception was designed to protect.  [United States v. Gaubert, 499 U.S.] at 325.

Motion to Amend at 7-8.  It is C. Warren's position, in light of that requisite analysis, primarily that "the Government's argument that all BOP decisions undertaken with respect to Mr. Warren's safety were discretionary is premature without the benefit of discovery, and moot in light of Plaintiff's request to amend."  Motion to Amend at 8.  C. Warren thus argues, that "BOP personnel are regulated in more ways than the Government acknowledges.  In fact, courts have held that federal corrections officers are subject to BOP mandates including BOP Program Statements, Institution Supplements, and Post Orders."  Motion to Amend at 9 (citing Sledge v. United States, 883 F. Supp. 2d 71, 77 (D.D.C. 2012)(Titus, J.)).  C. Warren explains:

> Program Statements apply to all BOP employees and cover all areas of responsibility for the agency, including inmate accountability, discipline, and visitation. . . .  Institutional Supplements, on the other hand, adapt the general Program Statements to a particular institution. . . .  Finally, institution-specific Post Orders apply to the specific position to which an officer is assigned. . . . [Sledge v. United States, 883 F. Supp. 2d at 77] . . . (describing three subcategories of Post Orders: (1) General Post Orders, guidelines applicable to

> any post in the institution; (2) Specific Post Orders, which are specific to a post
> and outline the timing of movements by inmates, equipment needed on the post,
> and approximate timeframes that certain procedures or activities should occur;
> and (3) Special Instructions, which describe a correctional staff member's
> responsibilities and expectations while serving on a particular post).  See also
> BOP Program Statement 5100.08 (mandating that "[e]ach institution must
> establish an Institution Supplement (IS) for [Receiving and Discharge] procedures
> that are unique to that facility").

Motion to Amend at 9.  C. Warren thus maintains that an analysis of all applicable Program

Statements, Institutional Supplements, and Post Orders will be of central importance in

considering whether the BOP officials were acting within their discretion, and that discovery into

these applicable BOP guidelines must occur before the MTD could be granted.  See Motion to

Amend at 10 (citing Sledge v. United States, 883 F. Supp. 2d at 95, which permitted discovery of

a wide range of internal BOP "program statements, institutional supplements, policy handbooks,

guidelines, training manuals, work schedules, work assignments, policy memoranda, post orders,

and other orders or instructions from the warden").  Indeed, C. Warren provides that "courts have

sounded caution against granting a 12(b)(1) motion predicated on the discretionary function

when the record is incomplete, as it is here."  Motion to Amend at 10 (citing Palay v. United

States, 349 F.3d 418, 429, 432 (7th Cir. 2003); Parrott v. United States, 536 F.3d 629, 638 (7th

Cir. 2008); Ignatiev v. United States, 238 F.3d 464, 467 (D.C. Cir. 2001); Chess v. Pindelski,

2010 WL 234992, at *4 (N.D. Ill. Jan. 15, 2010)(Andersen, J.).  C. Warren's main argument,

then, is that, on this record, it would be too soon to grant a MTD on the discretionary function

exception, because C. Warren has not had an adequate opportunity to undergo the requisite

discovery.  See Motion to Amend at 11.  C. Warren, thus, has made an attempt -- by her

proposed Second Amended Complaint -- to develop a more specific factual record to give the

Court more robust factual allegations that C. Warren argues suggest the discretionary function

exception's inapplicability to the present dispute.  See Motion to Amend at 11.  C. Warren,

however, next uses her Motion to Amend to make the argument that, "regardless of whether amendment is allowed, Plaintiff has set forth sufficient specific allegations to withstand dismissal for lack of jurisdiction."  Motion to Amend at 11.

C. Warren thus first focuses on her allegations relating to "BOP officials' conduct in negligently placing Mr. Warren and Ashley together in a communal holding cell," and states that although the First Amended Complaint was mistaken in its allegation that Ashley was subject to R. Warren's CIM Separation Order,

> additional discovery will undoubtedly turn up materials mandating that the two inmates be kept separate from one another, that Ashley be separated from the entire class of inmates to which Mr. Warren belongs, i.e., sex offenders, or that Warren be separated from white supremacist inmates as a whole, or from an entire category of inmates (sex offenders or white supremacist inmates) to which the other belonged.

Motion to Amend at 11-12.  C. Warren also targets the United States' assertion that its liability in this scenario is "dependent solely on its knowledge of a specific threat between Mr. Warren and Ashley," a knowledge that the United States contends it did not have, causing C. Warren to argue that BOP "personnel can be liable for inmate-on-inmate injuries if the plaintiff can show 'that BOP staff knew or reasonably should have known of a potential problem between' inmates." Motion to Amend at 12 (citing Parrott v. United States, 536 F.3d at 637).  Here, then, C. Warren maintains that,

> [u]tilizing this more accurate standard of the BOP's duty of care, the BOP's statutory obligation to provide "safekeeping" and "protection" to Mr. Warren under 18 U.S.C. § 4042 was not discharged merely because the BOP lacked knowledge of an identifiable threat between the men.  Instead, the operative Complaint sets forth specific allegations that, for example, Ashley's recent protective custody in [solitary confinement] for the protection of sex-offender inmates reasonably [placed] BOP staff [] on notice "of a potential problem" between Mr. Warren and Ashley when BOP placed them together in the [communal holding cell].

Motion to Amend at 13.

C. Warren next argues that, regarding the allegations surrounding BOP staff's failure to supervise the communal holding cell wherein Ashley killed R. Warren, "the Court cannot conclude as a matter of law that USP Victorville staff's decision not to monitor the holding cell in which Ashley and Mr. Warren were placed -- or to ensure Ashley's shackles were secured once inside -- were discretionary," at least "without the benefit of additional discovery into" relevant local BOP Victorville policies.  Motion to Amend at 13.  In support of her argument, C. Warren explains that in <u>Keller v. United States</u>, 811 F.3d 1021, 1025 (7th Cir. 2014), the United States Court of Appeals for the Seventh Circuit

> considered significant a BOP Program Statement requiring staff to "develop local procedures to clear inmates with a PSY ALERT assignment" to the plaintiff's claim that BOP staff had failed to consider his entire medical profile before releasing him into the general prison population.  Since "[t]hose procedures [were] not in the record the panel [could not] conclude as a matter of law that they did not constrain [the staffer's] discretion to place Keller in the general population."

Motion to Amend at 13-14 (quoting <u>Keller v. United States</u>, 811 F.3d at 1025).  Thus, C. Warren requests that the Court do as the Seventh Circuit did and not grant the United States' MTD without first "knowing the content of local directives," which are relevant to the Court's application of the "first prong of the discretionary function exception."  Motion to Amend at 14. Accordingly, C. Warren contends that "the Court cannot determine whether local directives granted USP Victorville staff 'room for choice' in supervising the R&D area. . . .  Nor can the Court determine whether BOP staff failed to comply with those directives, in such a fashion that their negligence would not be shielded by the discretionary function."  Motion to Amend at 14 (quoting <u>United States v. Gaubert</u>, 499 U.S. 315 at 324).  In this case, C. Warren remains convinced that "there remains the distinct possibility that institutional policies possibly removed that discretion from Victorville II staff members by mandating a course of conduct in supervising

the [inmate transfer] area" and that thus the United States cannot simply "invoke the protection of the discretionary function exception now, without more in the record, by arguing that its general statutory discretion grants it *carte blanche* discretion in all other decisions." Motion to Amend at 15 (citing <u>Boyd v. United States</u>, 881 F.2d 895, 898 (10th Cir. 1989)).

C. Warren next addresses the United States' argument that public policy supports its MTD and responds that "the operative Complaint proffers allegations that USP Victorville's supervision of the [inmate transfer area] was based on grounds other than considerations of public policy, namely, on staffers' negligent supervision of the area." Motion to Amend at 15. C. Warren states, as an example of the First Amended Complaint's relevant allegations, that she alleged that "BOP Program Statement 5100.08 mandated, among other things, that [s]ecurity inspections are necessary to . . . ensure the security, safety, and good order of the institution; [a]ll areas must be regularly inspected and [s]taff frequently inspect all areas in [the inmate transfer area] accessible to inmates." Motion to Amend at 15. Accordingly, C. Warren argues that R. Warren's death is evidence that the communal holding cell was not frequently inspected. <u>See</u> Motion to Amend at 15-16. C. Warren thus requests that, "because the Government cannot claim as a matter of law that the challenged conduct was grounded in public policy considerations," the Court deny the United States' MTD. Motion to Amend at 15-16.

C. Warren next addresses her proposed Second Amended Complaint, which she argues the Court should grant leave to file, because it further details how the BOP's designation of Mr. Warren to Victorville II, rather than to an institution commensurate with his low-security classification and program needs, constituted a violation of the FTCA." Motion to Amend at 17 (footnote omitted). Specifically, C. Warren explains that she has added detail regarding how,

> [w]hile BOP Program Statement 5100.08 authorizes employees of the BOP's
> Designation and Sentence Computation Center (DSCC) to apply a Management

> Variable . . . to an inmate's designation analysis, by which the inmate may be
> placed in an institution level inconsistent with the inmate's security score, the
> BOP's/DSCC's discretion to do so is not unfettered.

Motion to Amend at 17. Indeed, C. Warren explains that the proposed Second Amended
Complaint alleges that the "BOP was permitted to apply a Population Management [variable] to
Mr. Warren in a situation in which [he] require[d] housing in a facility which is not
commensurate with his or her security level," but that, regarding that management variable, the
relevant BOP Program Statement 5100.08, offers three example scenarios as to its applicability:
"facility activation; population pressures affecting available appropriate-level bed space within
500 miles of the inmate's anticipated release residence; [or] gang/security concerns." Motion to
Amend at 18 (internal quotation marks omitted). Here, accordingly, C. Warren argues that the
BOP was not reacting to one of those scenarios in designating R. Warren to Victorville II and
that thus her proposed Second Amended Complaint "asserts a plausible claim that the BOP acted
beyond the scope of is discretion in misapplying the [management variable] to Mr. Warren, and
that this misapplication was a proximate cause of his ultimate death." Motion to Amend at 18.
Although C. Warren concedes that "the general rule is that judicial review of BOP's application
of a [management variable] is precluded under 18 U.S.C. § 3625[1]," she further argues that said
"general rule does not apply when BOP fails to adhere to known limits on its discretion."
Motion to Amend at 18. C. Warren maintains, then, that the BOP's inexplicable decision to
misapply its own regulations "contravenes public policy" and that the negligent application of
the management variable in this case gives rise to liability on behalf of the United States.
Motion to Amend at 19.

     The Motion to Amend thus concludes with C. Warren's arguments regarding the standard

---

[1]Inapplicability of the Administrative Procedure Act.

for granting leave to amend a complaint.  <u>See</u> Motion to Amend at 19-21.  C. Warren explains

that, by her proposed Second Amended Complaint, she aims to:

> (1) set forth additional factual allegations showing the range of mandatory
> directives (including Institutional Supplements and Policy Orders) that were
> violated by the Government's challenged conduct; (2) jettison her assertion that
> Ashley was one of the redacted names on the September 3, 2011 CIM [Separation
> Order] . . . ; and (3) add additional factual allegations to her recitation of Ashley's
> prior history of violent acts against sex offenders.

Motion to Amend at 19.  C. Warren also argues that the proposed amendment is made in good

faith, and is not the result of undue delay, dilatory motive, or a previous failure to cure any

deficiencies.  <u>See</u> Motion to Amend at 19-20.  Regarding any potential prejudice to the United

States, C. Warren maintains that the proposed Second Amended Complaint does not raise

substantial new factual allegations or otherwise impact the United States' ability to prepare for

trial.  <u>See</u> Motion to Amend at 20.  Last, C. Warren argues that her proposed amendments are not

futile and that they instead

> shore up her existing claims by making plain that mandatory directives exist that,
> when a record is developed, will demonstrate that the BOP was not exercising any
> discretionary policy judgment in, inter alia, placing Mr. Warren in the same
> holding cell as Ashley, and then failing to properly monitor them or shackle
> Ashley.

Motion to Amend at 21.

### 3. <u>The Motion to Amend Response</u>.

The United States responded to the Motion to Amend with the United States of

America's Response in Opposition to Plaintiff's Motion for Leave to File an Amended

Complaint, filed September 23, 2016 (Doc. 39)("Motion to Amend Response").  The United

States, initially, argues that C. Warren did not seek its position on the Motion to Amend and that

the Court should thus deny the Motion to Amend.  <u>See</u> Motion to Amend Response at 1.  Beyond

that procedural argument, the United States opposes the Motion to Amend primarily because

"filing Plaintiff's proposed Second Amended Complaint would be futile."  Motion to Amend

Response at 1.  The proposed Second Amended Complaint would be futile, according to the

United States, because even the additional and modified factual allegations fail to bring C.

Warren's claims "outside the discretionary function exception to the FTCA."  Motion to Amend

Response at 3.

Ultimately, the United States characterizes C. Warren's proposed amendments as adding

allegations that: (i) R. Warren told C. Warren that inmates somehow had enough information

about him to have researched his charges, that BOP staff had provided his full name to the other

inmates, and that it was known that Ashley used Lexis Nexis services at the prison to identify

incoming inmates with sex-offender status; (ii) Ashley had a more significant history of violence

than was previously alleged; (iii) BOP had in place an order that R. Warren remain segregated

from inmates posing a threat to his safety, namely "influential white inmates known to prey on

inmate sex offenders"; (iv) BOP mandated that Ashley be segregated from those to whom he

posed risks, such as sex-offender status inmates; (v) BOP failed to secure Ashley's waist chain,

in contravention of "BOP Program Statements, Institutional Supplements, and/or Post Orders

propounded by the institution"; (vi) BOP failed to attend the communal holding cell in

contravention of "BOP Program Statements, Institutional Supplements, and/or Post orders"; and

(vii) BOP generally failed to "comply with . . . CIM separation assignments, BOP Program

Statements, Institutional Supplements, and/or Post Orders" in its failure to exercise reasonable

care to ensure R. Warren's safety.  Motion to Amend Response at 2-3.  Also, according to the

United States, C. Warren's proposed Second Amended Complaint retracts allegations that

Ashley was a subject of R. Warren's CIM Separation Order.  See Motion to Amend Response at

2.  According to the United States, even with these amendments, C. Warren essentially stakes her

claims "on the following purportedly negligent or wrongful acts: (1) placement of Mr. Warren at

the Federal Correctional Institution II in Victorville, California . . . ; (2) failing to keep Mr.

Warren and Mr. Ashley separated; (3) inadequate supervision of the holding cell; and (4) failing

to tightly secure Mr. Ashley's restraints."  Motion to Amend Response at 4 (internal quotation

marks and citation omitted).  Those actions, the United States contends, all "fall within the

discretionary function exception of the FTCA."  Motion to Amend Response at 4.

Thus, turning first to the category of C. Warren's allegations regarding BOP's placement

of R. Warren at Victorville II, the United States contends that such a designation is subject to the

discretionary function exception, and that C. Warren has not proposed any amendments relevant

to this allegation.  See Motion to Amend Response at 4.  That, the United States argues, renders

the proposed Second Amended Complaint futile as to this category of allegations.  See Motion to

Amend Response at 4.  The United States next addresses the category of C. Warren's allegations

regarding BOP's decision to hold Ashley and R. Warren in the same communal holding cell

before their transfers, and argues that, despite the proposed Second Amended Complaint's new

factual allegations, "no BOP Program Statement or FCI II Victorville Institutional Supplement or

Post Order . . . required separation of Mr. Warren or any class of inmates to which Mr. Warren

belonged from Mr. Ashley or any class of inmates to which Mr. Ashley belonged."  Motion to

Amend Response at 5.  Thus, the United States maintains that BOP "decisions regarding the

provision of security, including day to day decisions regarding placement of inmates in holding

cells . . . falls within the discretionary function of the FTCA."  Motion to Amend Response at 5.

The United States then considers the proposed Second Amended Complaint's new factual

allegations regarding BOP's failure to securely fasten Ashley's restraints, and argues that

"[t]here w[as] . . . no BOP Program Statement or FCI II Institutional Supplement or Post Order

[that] mandate[s] specifically how tight to apply restraints." Motion to Amend Response at 5. Further, because Ashley and R. Warren were in a communal holding cell at the time of the murder, the United States provides that "[t]here were no mandatory requirements that the inmates be restrained in the holding cell." Motion to Amend Response at 5. The application and tightness of restraints, then, constitutes BOP staff's "discretionary decision made by balancing public policy considerations," thus falling "within the discretionary function exception to the FTCA." Motion to Amend Response at 5-6. Last, regarding the proposed Second Amended Complaint's new factual allegations regarding the BOP's failure to supervise the transferring-inmates' communal holding cell, the United States once more maintains that "there are no BOP Program Statements, Institutional Supplements, or Post Orders that specify how holding cells are monitored." Motion to Amend Response at 6. The United States thus concludes that all of the additional factual allegations in the proposed Second Amended Complaint nonetheless render the Second Amended Complaint futile, because all of the challenged conduct is subject to the FTCA's discretionary function exception. See Motion to Amend Response at 6-7.

### 4.     The MTD Reply.

The United States replied to its MTD and the arguments in C. Warren's Motion to Amend with The United States' Reply in Support of its Motion to Dismiss for Lack of Jurisdiction, filed September 2, 2016 (Doc. 35)("MTD Reply). The MTD Reply begins by characterizing C. Warren's procedural tactics in the case thus far -- she "essentially concedes the United States' Motion to Dismiss her First Amended Complaint, but seeks to avoid the Motion by filing a Second Amended Complaint." MTD Reply at 1. The United States next takes the opportunity to, again, detail R. Warren's conduct leading to his conviction and subsequent incarceration, and explain that the United States is nonetheless prosecuting Ashley for killing R.

Warren.  See MTD Reply at 1-4.  The United States then reiterates its argument that the United

States enjoys sovereign immunity from C. Warren's claims.  See MTD Reply at 4.

According to the United States, the BOP has been delegated "an enormous responsibility,

as BOP has well over 150,000 federal inmates in custody," and that "in carrying out its statutory

mandate, BOP has to weigh many competing concerns, including the safety and personal

integrity of any single prisoner, the safety and personal integrity of the prison population as a

whole, staff safety, public safety, and of course appropriate allocation of limited financial

resources."  MTD Reply at 4-5.  The United States thus contends:

> When, as here, "established governmental policy, as expressed or implied by
> statute, regulation, or agency guidelines, allows a Government agent to exercise
> discretion, it must be presumed that the agent's acts are grounded in policy when
> exercising that discretion." . . .  This presumption is not limited to decisions at the
> policy or planning level -- it also applies to decisions made at the operational
> level.

MTD Reply at 5 (quoting United States v. Gaubert, 499 U.S. at 324-25).  The United States

thereby requests that the Court grant its MTD, because there are no factual allegations in the

First Amended Complaint that the "challenged actions are not the kind of conduct that can be

said to be grounded in the policy of the regulatory regime."  MTD Reply at 5.

The United States then addresses C. Warren's argument that she has not had the

opportunity to conduct sufficient discovery to fully substantiate how her allegations remove the

challenged BOP conduct from the discretionary function exception.  See MTD Reply at 5.

According to the United States, it does not oppose helping C. Warren undertake limited

discovery regarding the MTD "based on the discretionary function exception to" the FTCA.

MTD Reply at 5-6.  The United States concedes that, "[a]s a general matter, discovery regarding

'program statements, institutional supplements, and post orders' specific to Victorville II and

Victorville USP appears appropriate."  MTD Reply at 6.  The United States argues, however, that C. Warren has not yet made an effort to obtain such discovery.  See MTD Reply at 6.

The United States next argues that C. Warren fails to "alert this Court to a specific mandatory requirement" regarding BOP staff's conduct, and refers only to "one purportedly mandatory obligation . . . [: Program Statement] 5100.08 [which] requires security inspections." MTD Reply at 6.  The United States asserts that, even that Program Statement contains only "non-specific" language, "leaving the frequency of such inspections to the judgment of the BOP official."  MTD Reply at 6.  Thus, the United States maintains that any of C. Warren's allegations relying on the ambiguous requirement that the BOP staff make security inspections must fail, because those "alleged non-specific requirements do not defeat the discretionary function exception to the FTCA."  MTD Reply at 7.

Thus, because C. Warren has not complained of conduct that violates a mandatory "statute, regulation, or policy," or pointed to "any particular action that is not the kind of conduct that can be said to be grounded in the policy," and instead argues only that the "BOP acted negligently, failed to actually weigh policy considerations in this particular case, or abused its discretion," the United States reiterates that the discretionary function exception bars C. Warren's claims.  MTD Reply at 7.  Regarding C. Warren's argument that the United States had some duty to protect R. Warren, because it allegedly had knowledge of R. Warren's susceptibility to danger at the hands of Ashley and other white inmates, the United States maintains that such an argument does not address whether, as an initial matter, the United States waived its sovereign immunity to such a claim under the FTCA.  See MTD Reply at 7-8 n.3. That is, according to the United States, a "[w]aiver of sovereign immunity under the FTCA is subject to the discretionary function exception which applies to any action that involves a

discretionary function" -- "'whether or not the discretion involved be abused.'"  MTD Reply at 8

(quoting 28 U.S.C. § 2680).  Thus, the United States explains that the United States Court of

Appeals for the Tenth Circuit "will first determine whether there is subject matter jurisdiction"

before considering arguments regarding an alleged tortfeasor's negligence, because "[p]urported

abuse of discretion and negligence have no place in the discretionary function analysis."  MTD

Reply at 9.  Thus, given the First Amended Complaint's failure to identify a specific mandate

that the BOP contravened, the United States argues that the Tenth Circuit would not allow

"discovery regarding negligence," or "otherwise consider[] the possibility of negligence or abuse

of discretion when analyzing whether the discretionary function exception to the FTCA

applie[s]."  MTD Reply at 12.

### 5. The Motion to Amend Reply.

C. Warren supported her Motion to Amend with the Plaintiff Carol Warren's Reply to the

United States' *Response in Opposition to Plaintiff's Motion for Leave to Amend the Complaint*

(Doc. 39), filed January 9, 2017 (Doc. 46)("Motion to Amend Reply").  C. Warren maintains, in

her Motion to Amend Reply, that she has satisfactorily provided additional factual support for

> her claim that USP Victorville employees' longstanding, notorious disregard for
> the safety of sex-offender inmates led directly to the brutal murder of [R. Warren]
> . . . .  To that end, Plaintiff's proposed amendments provide additional examples
> of the mandatory directives that were violated by the Government in placing
> Frederick Ashley -- an influential white inmate on the cusp of transfer to a
> maximum-security prison because of his long history of violence toward sex
> offenders -- in the same holding cell as Mr. Warren and then failing to properly
> restrain or monitor him.  Plaintiff also sets forth a series of factual allegations
> detailing Ashley's well known history of violent acts against inmate sex offenders
> in Victorville.  The latter allegations are not mere window-dressing; rather, they
> provide direct support for Plaintiff's argument that the BOP's duty of care under
> the FTCA extends to what 'BOP staff knew or reasonably should have known'
> regarding the potential for violence Ashley posed to Mr. Warren.

Motion to Amend Reply at 1-2.  Accordingly, the balance of the Motion to Amend Reply argues that leave to file the proposed Second Amended Complaint would not be futile, and the Court should grant leave to amend.  See Motion to Amend Reply at 2-3.

C. Warren, then, first addresses the United States' contention in the Motion to Amend Response that she failed to seek the United States' position before she filed the Motion to Amend.  See Motion to Amend Reply at 3.  C. Warren explains that, because the Motion to Amend doubled as her response to the MTD, it would not have been normal practice to provide the Motion to Amend to the United States before she filed it.  See Motion to Amend Reply at 3. In addition, and regardless, C. Warren explains that the United States was involved in "lengthy discussions" with her about the possibility of amending the First Amended Complaint, and that, thus, there is no prejudice to the United States.  See Motion to Amend Reply at 3.

C. Warren next argues that the United States fails to demonstrate that no mandatory directives exist in the record, and that, thus, regarding the evidence the United States proffers in arguing that no such directives exist, in the form of BOP officials' declarations[2] and private documents, she and

---

[2]The Motion to Amend Reply, for clarity, provides:

In support of [its] position, the Government cites generally to the declaration of Victorville employee Derek Eber, though it does not identify any aspect of Eber's declaration that supports its argument.  The Government further cites to a section of the declaration of BOP employee Eric Davis in which Davis testifies generally that "there was no BOP policy which required Mr. Warren to be kept separate from Mr. Ashley" at the time of the killing; that BOP Program Statement 5180.05, which "is not available to the public," allowed "staff to use judgment in ordering the separation of specific inmates from each other"; and that there was no separation order separating Mr. Warren from Ashley or "from any disruptive group."

Motion to Amend Reply at 5.

the Court are presumably invited to take it on faith that any inconsistencies between [BOP] officials' . . . declarations should be resolved in favor of the Government; that non-public BOP documents [BOP] officials purport to quote but withhold from view say what the Government says they do; and that there is nothing to be gained from allowing Plaintiff to gain access to the documents generated in connection with her husband's murder or the files relating to what was known about the risk of danger posed by his killer.

Motion to Amend Reply at 4.  C. Warren then contends that the decision to place R. Warren in the same communal holding cell as Ashley, was, according to her expert -- a prison management consultant -- likely subject to a variety of local Victorville directives and separation orders pertaining to Ashley which C. Warren should be able to attempt to discover.  See Motion to Amend Reply at 5 (citing Mark Bezy Affidavit ¶ 11, at 3 (executed January 9, 2017), filed January 9, 2017 (Doc. 46-1)("Bezy Aff.")).  C. Warren explains that "Transfer Notice and In-Transit Data Forms" likely exist which depict security codes and the level of supervision each inmate requires during transit, and that those forms "have the force of an order, and would have made clear to any BOP employees involved in the transfer process that Mr. Ashley posed a threat of violence to an inmate sex offender like Mr. Warren if they were placed together."  Motion to Amend Reply at 6 (referencing Bezy Aff. ¶ 21, at 5).  And, to the extent that the United States is attempting to withhold from discovery any non-public BOP Program Statements or policies that might pertain to placement of inmates in communal holding cells, C. Warren maintains that the Court's in camera review -- as opposed to dismissal of a cause of action -- is the proper way to deal with these sensitive BOP documents.  See Motion to Amend Reply at 6.

C. Warren then addresses the BOP's failure to tighten Ashley's restraints, and argues that, in its Motion to Amend Response, the United States argued only that "no Program Statement, FCI II Institutional Supplement, or Post Order mandated specifically how tight to apply to restraints."  Motion to Amend Reply at 6.  This argument, according to C. Warren, does

not sufficiently demonstrate the proposed Second Amended Complaint's allegations that the "BOP staffers' failure to secure Ashley's waist chain and shackles was a violation of mandatory directives, which could include Program Statements, Institutional Supplements, and/or Post Orders," are futile.  Motion to Amend Reply at 6-7.  Accordingly, on this issue, C. Warren contends that the record does not, one way or the other, "settle[] the issue of whether the employees' failure to properly restrain Ashley violated the FTCA."  Motion to Amend Reply at 7.

C. Warren next explains that the proposed Second Amended Complaint proffers several new examples of the types of mandatory directives that were violated by BOP staff in leaving the communal holding cell unattended with Ashley and Mr. Warren inside, including "BOP Program Statements, Institutional Supplements, and/or Post Orders propounded by the institution."  Motion to Amend Reply at 8.  Thus, in reply to the Motion to Amend Response, where the United States summarily states that no such directives existed, C. Warren argues that the United States has not satisfactorily demonstrated how her allegations are thereby futile.  See Motion to Amend Reply at 8.  Accordingly, C. Warren points to the Davis Aff., upon which the United States relies, and argues that the Davis Aff. confirms the existence of BOP Program Statement 5800.12, which requires: "All areas must be regularly inspected. . . .  Holding cells should be situated so that staff have visual contact at all times."  Motion to Amend Reply at 8 (citing BOP Program Statement 5800.12).  C. Warren then concludes this section of argument by stating that, "because Plaintiff's proposed Second Amended Complaint identifies multiple written orders that were violated by BOP employees, resulting in Mr. Warren's brutal attack and death, amendment would not be futile and should be appropriately granted."  Motion to Amend Reply at 9.

C. Warren next argues that, in contrast to the United States' argument in the Motion to Amend Response, the United States "potential liability does not hinge on the existence of a written order." Motion to Amend Reply at 9. C. Warren contends that the United States is failing to "acknowledge the actual duty of care that it owed to Mr. Warren" by focusing its argument on whether "a written order existed that either specifically mandated that Ashley be kept separate from Mr. Warren or prescribed the exact method for restraining an inmate in Ashley's situation." Motion to Amend Reply at 9. Instead, C. Warren explains that Courts of Appeal have held, in contrast, that "the Government's liability under the FTCA for inmate-on-inmate injuries extends to what BOP staff knew or reasonably should have known regarding a potential threat posed by one inmate towards another." Motion to Amend Reply at 10 (citing Parrott v. United States, 536 F.3d at 637)(internal quotation marks and emphasis omitted). In making this argument, C. Warren relies on the Seventh Circuit's conclusion that a "district court's inquiry should have extended to what BOP officials should have known about the risks of placing the plaintiff together with his assailant," where the district court had, instead, granted summary judgment in favor of the BOP officials -- for a failure to protect claim which an inmate whom was stabbed 22 times by another inmate brought -- by reasoning "that BOP officials could only be liable if they knew of a potential problem between the two inmates before the assault, as demonstrated by some kind of order." Motion to Amend Reply at 10. According to C. Warren, this interpretation of the duty of care that BOP employees owe inmates, and its interaction with the FTCA, has "been adopted by multiple other federal courts, and has not been rejected by the Tenth Circuit." Motion to Amend Reply at 10 (citing Brown v. United States, 486 F.2d 284, 288-89 (8th Cir. 1973)(analyzing the BOP's liability in a federal prisoner's failure-to-protect suit in terms of what "the federal government knew or reasonably should have known"); Tyree v.

United States, 2016 WL 1128486, at *1 (4th Cir. 2016)("BOP personnel can only be deemed

negligent in violation of [its duty of care] when personnel knew or reasonably should have

known of potential problems between inmates."); Jones v. United States, 2012 WL 3777076, at

*6-7 (N.D.W. Va. 2012)).

> C. Warren's argument, then, is that:

> Indeed, the widespread acknowledgment of the BOP's broader duty of care is of a piece with a larger body of case law which makes it clear that, if the FTCA is to have any application at all, the discretionary function exception cannot swallow the rule. These cases make it clear that every dangerous decision made by federal actors that was not specifically forbidden by written regulation cannot be mechanically rubber-stamped a discretionary act.

Motion the Amend Reply at 11 (citing Soldano v. United States, 453 F.3d 1140, 1150 (9th Cir.

2006)(holding that the National Park Service's general discretion to design a road did not allow

it to disregard "basic, scientific safety specifications" by failing "to set a speed limit consistent

with [its] design choices")). That is, even though there is no "specific directive for employees of

a federal agency to keep an open flame away from gasoline," C Warren asserts that, should a

federal employee choose to light a fire by gasoline, "it would be absurd to dismiss the suit of a

citizen injured in the subsequent explosion on account of the discretionary function exception."

Motion to Amend Reply at 11 (internal quotation marks omitted). According to C. Warren, that

logic suggests that

> even if the Government's submissions convince the Court that no specific written order exists in the record that could have saved Mr. Warren from being tortured to death by Ashley, the Government nevertheless remains liable under the FTCA, for blatantly ignoring ample evidence of the direct threat to Mr. Warren that Ashley posed.

Motion to Amend Reply at 12.

> C. Warren last argues that the United States, nonetheless, has failed to demonstrate the

applicability of the discretionary function exception to the FTCA, because it has failed to

demonstrate how its "negligent supervision" of the transferring-inmate communal holding cell was otherwise "grounded in public policy considerations," which is necessary to justify its exercise of discretion.  Motion to Amend Reply at 12 (citing <u>United States v. Gaubert</u>, 499 U.S. at 325 (setting forth the second prong of the "discretionary function exception" test, which requires the court to determine that "the judgment or choice in question [is] grounded in considerations of public policy or susceptible to policy analysis" for the exception to apply); <u>Hardscrabble Ranch, L.L.C. v. United States</u>, 840 F.3d 1216, 1223 (10th Cir. 2016)(explaining that "the discretionary action must be based on the purposes of the applicable regulatory regime")).  According to C. Warren, where there is a risk of serious danger there cannot be a policy consideration that justifies the United States' "inattentiveness or failure to intervene." Motion to Amend Reply at 13 (citing <u>Andrulonis v. United States</u>, 952 F.2d 652, 655 (2d Cir. 1991)(holding that the "discretionary function exception" was inapplicable to a Center for Disease Control scientist's failure to maintain safety procedures and to warn laboratory workers about a dangerous rabies sample to which he had exposed them)).  Thus, C. Warren concludes the Motion to Amend Reply by arguing that the "USP Victorville employees failed to do their jobs when they left a communal holding cell completely unmonitored for over two hours, and then Government cannot shield itself by claiming that this egregious failure was motivated by some nebulous policy decision."  Motion to Amend Reply at 14.

### 6.    The February 22, 2017, Hearing.

The Court held a hearing on February 22, 2017.  <u>See</u> Draft Transcript of Hearing, taken February 22, 2017 ("Tr.").[3]  The Court first indicated that "what's going to need to be done is I'm just going to have to sit down and craft an opinion that deals with each one of these incidents

---

[3]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

that the plaintiff want[s] me to focus on and see what's left and then see if the amended complaint would assist in any way."  Tr. at 3:6-11 (Court).  The United States, accordingly, suggested that the Court hear argument broken into the categories of different conduct which C. Warren alleges give rise to federal jurisdiction over her claim.  See Tr. at 3:19-4:3 (Keegan). Those categories are: (i) the BOP's broader duty to protect R. Warren; (ii) the BOP's decision to house R. Warren at Victorville II; (iii) the BOP's placement of Ashley and R. Warren in the same communal holding cell; (iv) the BOP's failure to securely tighten Ashley's waist chain; and (v) the BOP's failure to frequently inspect and supervise the inmate transfer area where the communal holding cell was situated.  See Tr. at 4:7-14 (Keegan).  Regarding the first category, the BOP's broader duty to protect R. Warren, the United States maintained that such a duty was irrelevant, as "[t]he question before the Court is whether there is a specific action . . . falls either within or . . . outside of the discretionary function exception," and a "broad duty to protect" falls within the FTCA's discretionary function exception.  Tr. at 5:1-5, 5:15-17 (Keegan).  C. Warren then explained that "what I hear the Government saying is there is not a specific enough mandate that we have alleged that the defendants have violated in order to give federal jurisdiction."  Tr. at 6:5-9 (Lowry).  C. Warren argued that, "if the United States had information that they knew or reasonably should have known about a specific threat to Mr. Warren then they under this broader duty, combined with this specific information . . . they would have had a duty even under the [FTCA] to step in and neutralize that threat."  Tr. at 6:23-7:4 (Lowry).  The Court pressed C. Warren, however, to identify a statute, regulation, or interpretation that took "discretion away from the offers to how they handle a certain situation," Tr. at 10:9-13 (Court), to which C. Warren suggested:

> The Court is absolutely right that you would be looking for some sort of either a statute, a policy decision, a regulation or some type of interpretive guideline that

would dictate whether or not discretion was in play under the circumstances.  But that doesn't necessarily end the analysis, and I agree with the United States presentation of the issue, it's a two part analysis.   The first is was it a discretionary act.  And even if it is a discretionary arrangement[] then the Court has to look at [whether] that the type of discretionary act . . . was grounded in policy considerations that warrant the application of the discretionary function exception.  So it's still a two part test.  And what we're suggesting taken in this broader overview, even if one conceded that the Bureau of Prisons might have and actually in terms of [ma]ny facets of their operation broad areas of discretion to how they place inmates and where they place inmates, and how inmates commingle together, that when they're faced with specific and actionable information that you know, possible violence might erupt under given circumstances, that even in the absence of a controlling statute or regulation or policy that they would have a duty to step in <u>because there is frankly no public policy consideration that would address that kind of even concededly discretionary act, that some decisions are so far removed from any you know viable policy consideration that it's that attenuated from public policy to be worthy of the application of discretionary function</u>.

Tr. at 10:16-11:21 (Lowry)(emphasis added).  C. Warren then cited <u>Palay v. United States</u>, 349 F.3d at 429-32, a Seventh Circuit case that undergoes a broader FTCA analysis by stating, in dicta, that one theory of relief for an inmate injured by prison exercise equipment might involve looking at whether negligent "routine maintenance and inspections [are] worthy of a policy consideration that invoke[s] the discretionary function exception."  Tr. at 13:3-5 (Lowry).  In a case such as <u>Palay v. United States</u>, C. Warren argued, "there is no viable policy consideration at issue for failing to stop a situation that would knowingly be violent about which the Government [k]new or should have known."  Tr. at 13:21-24 (Lowry).  C. Warren maintained, however, that she was not wholly dropping her original argument that positive regulations nonetheless existed and were not followed, pointing specifically to her belief that secondary discovery would yield such regulation, perhaps in the form of "transit data forms," or some other orders and paperwork relating to Ashley's detainment, as opposed to R. Warren's.  Tr. at 14:2 (Lowry).  According to C. Warren, Ashley was a known-violent offender, whose underlying conviction entailed violence -- armed bank robbery -- and who had, on multiple occasions, attempted to murder and assault

other inmates, particularly those with sex-offender status.  See Tr. at 14:8-16 (Lowry).  The

Court, however, posited that there was "enough here" to "assume that Ashley is a pretty violent

person, and the Government was on notice of that . . . [but] the Government i[s] not coming in

and really refuting that," and instead, the United States is making a threshold jurisdictional

argument in its MTD.  Tr. at 14:17-25 (Court).  In fact, the Court indicated, that "it seems to me

that probably you've teed it up pretty much in your favor.  Ashley is a violent person and the

Government knew it," and "I have enough of a sense as to White Supremacist and Aryan

Brotherhood for example how they feel about people that engage in child pornography . . . I

think that probably [that] inference would go your way."  Tr. at 15:7-10; 21-24 (Court).

          C. Warren then argued regarding her concerns about the limited discovery thus far in the

litigation, and how it would be premature to grant a MTD at this stage, because

> the jurisdictional issue is so intertwined with the facts of this case that it would be
> premature for the judge to cast judgment on this particular jurisdictional issue at
> this time until plaintiffs were provided the opportunity to get discovery to support
> the claim.  Because the standard is when the Court examines this, it can, is the
> Government successful in showing that the plaintiffs can't come up with any
> conceivable set of facts that would warrant federal jurisdiction in this case and
> what I'm attempting to suggest to Your Honor through this argument both now
> and throughout the entire afternoon will be that the plaintiff can develop a set of
> facts if given the right to discovery.

Tr. at 16:15-17:4 (Lowry).  The Court, though, continued to press C. Warren, stating:

> I'm sitting here saying I think I can assume those facts [that Ashley was violent,
> particularly toward sex-offender status inmates] to write an opinion[,] I guess I'm
> wondering how much more discovery would really be useful before we go ahead
> and decide some of the legal issues that I think are teed up here.

Tr. at 17:6-11 (Court).  In response, C. Warren pointed the Court to the Bezy Aff., wherein Bezy

talked about a "transfer notice," or "transit data form," which is a form that alerts the people that

were in

          control of that transfer [so they] would have some idea of the history of violence,

> the nature of that violence, and they would know nonroutine security measures that needed to take place, and there was a special, you know all kinds of actionable information that I think would, the Court could easily benefit from to say [that,] not only was the Bureau of Prisons[,] as a general matter[,] aware of Ashley's propensity towards violence with individuals like Mr. Warren, but the actual people that were in charge of his transfer were made . . . aware of that in this type of information, and we don't have access to that [form for Ashley as of yet], and I think that bears on the court's analysis, frankly.

Tr. at 17:20-18:8 (Lowry).  Accordingly, C. Warren maintained that "she was only suggesting . . . that the Court needs to look at each case on a case by case basis to determine what the Government [k]new and when they knew it.   Because depending on how pointed that information was the Government may well have had an un[a]voidable duty to intervene," in the absence of some obvious regulation taking away BOP officials' discretion in a particular manner. Tr. at 19:7-12 (Lowry).  That is, where a BOP officer is made aware of a threat to an inmate's life, C. Warren contends that "at that point I don't think that officer has the discretion to ignore the threat and the means to carry out the threat that's right before him."  Tr. at 19:20-23 (Lowry).  Thus, regarding the benefit of discovery, C. Warren suggested that, with

> the benefit of full discovery the Court could delay the consideration of the jurisdictional argument on this particular issue to a later time to see whether the plaintiffs can muster sufficient evidence of knowledge on the Government's part to undermine any kind of policy driven analysis that would justify application of the discretionary function exception.

Tr. at 20:19-21:1 (Lowry).

The United States then responded to C. Warren's argument regarding the BOP's broad duty to protect inmates -- where BOP officials are aware of a threat -- and the consequent request for more discovery, and argued:

> [W]hat I heard from plaintiff is the complaint is really the failure to separate these two inmates.  And I think the confusion is coming in and mixing up negligence with the discretionary function.  And it sounds like the discovery that plaintiffs are seeking are discovery to indicate that the United States was negligent.  And I would submit to the Court, and I think the Court [has] acknowledged in many of

> its opinions, and the Tenth Circuit has said it itself, negligence is not a factor. Neither is the subjective intent of an individual actor. The question before the Court is whether the action complained of, which here is failure to separate these two inmates, whether that is based, whether there is a mandatory order or obligation to separate them, which I believe the plaintiffs concede there was not. And then, if not, was the decision not to separate them based in public policy . . . [and] when there is a statute regulation or agency guidelines that allow a Government agent to exercise discretion it is presumed that the agents acts are grounded in policy when exercising this discretion, and in this case BOP is attempting to move a lot of prisoners . . . and they have limited resources and they are balancing these resources, and trying to keep everyone safe while at the same time getting all these prisoners on the right buses to go in the right locations, there is a lot going on, and they have a lot of balancing to do. So you know, discovery into the negligence doesn't assist in terms of resolving this motion to dismiss.

Tr. at 24:3-17 (Keegan). The United States then conceded that Ashley is "a bad guy" and that "if BOP had the information today there would have been a separation order, and if they violated that order that would have taken us outside the discretionary function." Tr. at 25:6-10 (Keegan). The United States then further conceded that the Court was free to "assume that Mr. Ashley was a very dangerous person, violent person, somebody that shouldn't have been around somebody that watched child pornography." Tr. at 25:24-26:1 (Court); id. 26:5-9 (Keegan). The United States, however, did not think that the Court should also assume that BOP staff "knew and should have known that he was a person that shouldn't have been together with Mr. Warren," Tr. at 26:13-17 (Court), because

> as you know, the Bureau of Prisons has a variety of employees, and if you put all the information together, maybe as an institution you could assume that. But to assume any one employee had all that information there is no indication that is the case, but again I believe that goes to negligence,

Tr. at 26:19-25 (Keegan). At this point in the hearing, the Court expressed concern that it would not do the Court or the parties any good to not allow more pervasive discovery at this stage, because the Court could then be in the position where the Tenth Circuit rejects its opinion by holding that the Court should have ordered more discovery. See Tr. at 27:5-12 (Court). The

United States responded that, what it had anticipated from C. Warren was her requesting

> program statements, regulations, any, outstanding orders of separation or
> confinement, or you know, searching for mandatory obligations that might apply
> to this case.  I think that's fair, and that's yes degree, you know, a year ago that I
> was open to that kind of discovery.  But I don't think discovery into negligence is
> relevant in any manner.

Tr. at 27:14-21 (Keegan).  The United States then elaborated that the notion of negligence, on

which it is resisting discovery, entailed the Court's finding that it was "negligent in placing them

in the same cell," because "that is not what the Court is to consider, the Court is to consider

whether that decision, that action of placing them there is susceptible to policy analysis."  Tr. at

27:25-28:3 (Keegan).  The United States also then reiterated that there is no explicit separation

order applicable to Ashley and R. Warren, and that there is thus no need for additional discovery.

See Tr. at 28:20-29:6 (Keegan).  The United States then concluded that it was and has been open

to further discovery -- under a protective order -- of "post orders . . . program statements and

institutional supplements," so "they can make their arguments to get [past the] discretionary

function but as far as discovery into the substance, negligence of their claims, that does not go to

discretionary function."  Tr. at 30:3-7 (Keegan).

The United States next argued about the "transit data form" that C. Warren noted in her

argument and explained that such a form might contain information about separation orders, but

that R. Warren's in particular did not contain such information regarding Ashley.  Tr. at 30:20-25

(Keegan).  At this point, the Court changed the topic to the fact that R. Warren ended up in a

medium security facility, which the Court considered high for a "71 year old lawyer."  Tr. at

33:18-23 (Court).  The United States responded that the BOP's designation of R. Warren to

medium security was based upon the application of multiple discretionary decisions and that, in

particular, R. Warren was designated according to population management concerns.  See Tr. at

33:24-34:5 (Keegan).  The Court then took this opportunity to pause the hearing and reorganize

the argument according to the categories of allegations outlined at the beginning of the hearing,

and C. Warren stated that her argument thus far regarding the broader duty to protect R. Warren

was satisfactory, and that she would next address the issue of Ashley and R. Warren's alleged

separation.  See Tr. at 35:2-6 (Lowry).  C. Warren first addressed the issue that, although the

First Amended Complaint alleges that Ashley was subject to R. Warren's separation order, she

subsequently discovered that that allegation was untrue, but explained that she was still not

convinced that there were no separation orders that might be held by Ashley.  See Tr. at 35:11-16

(Lowry).  Accordingly, C. Warren explained that she had requested a variety of information from

the United States relating to reports which the BOP might have on Ashley that would "indicate

that Mr. Ashley was a threat to anybody with a child offense or especially a child pornography

offense."  Tr. at 36:2-4 (Lowry).  C. Warren thus reiterated that

> I will agree with the United States that certainly Mr. Warren['s] separatee data
> does not indicate that he was supposed to be kept away from Mr. Ashley.  But I'm
> not convinced that the knowledge . . . in the BOP's possession with regard to Mr.
> Ashley would say the same with regard to Mr. Warren.  That's my concern.

Tr. at 36:20-37:2 (Lowry).  Accordingly, C. Warren argued that the case law on this FTCA issue

indicates that, particularly in cases such as this one, "the Court needs to go on a case by case

basis when making the policy analysis, and each case is going to turn on the unique facts [of]

that case."  Tr. at 37:15-18 (Lowry)(citing United States v. Shanksy, 164 F.3d 688 (1st Cir.

1999)).  C. Warren also expressed hesitation at being required to "rely on the Government's

statements, broad statements [that] there is just nothing there," and that there exist no policy

statements or regulations left to be potentially discovered.  Tr. at 37:25-38:15 (Lowry).  In

particular, regarding the supervision of the inmate transfer area, C. Warren explained that there

are broad policy statements that "the physical layout," "in order to provide a safe and secure area

for intake and release processing . . . is of utmost importance."  Tr. at 38:12-15 (Lowry).

Further, C. Warren explained that there are

> Bureau of Prisons policy statements . . . that holding cells should be situated so that staff have visual contact of the holding cell at all times.  And if the physical plant [interferes with] such visual contact meaning the line of sight contact, other alternatives such as mirrors or camera or equipment should be used to maintain visual on site review of the holding cell at all times.

Tr. at 38:15-24 (Lowry).  Here, C. Warren argued,

> [W]e've alleged that this assault and I don't want to dive too far into discovery but if you look at the autopsy report, and as we've alleged in the complaint this was a prolonged, vicious attack that lasted, we think, on the order of an hour or more.  And the reason I say that, Your Honor, is there was a struggle inside that cell.  Frederick Ashley -- the coroner's report and the autopsy report indicates he tried to strangle Mr. Warren, was unsuccessful in strangling Mr. Warren, and that after that attempt failed, there was a repeated physical assault in which there were numerous, more than I can recount here, batterings that took place.  Including stomping his head in.  There are literally visual, there are imprints of Ashley's shoe sole on Mr. Warren's face, numerous of them, and on his throat, so this wasn't just a quick and dirty, happenstance, over in a flash assault.  And had the United States lived up to their . . . obligations to keep line of sight on this cell, this could have easily been prevented.

Tr. at 39:8-25 (Lowry)(emphasis added).  The Court then addressed C. Warren's concerns about

taking the United States at its word and regarding discovery, suggesting:

> [W]hy don't you take everything the Government is offering, I mean and look through that.  I mean and if you see anything, send it to me, and of course I'll keep this in mind as I write the opinion.  And if I think that you should have gotten more, I can either say the Government needs to provide more on a specific area.  Why don't you take everything that the Government is willing to give you.

Tr. at 40:7-15 (Court).

The United States then reiterated that, although it was broadening the information it was

willing to allow be discovered, it still resisted discovery of any investigations that may exist

regarding other violent incidents involving Ashley, because that is "just simply not relevant to

the discretionary function analysis."  Tr. at 41:22-24 (Keegan).  The Court then questioned C.

- 45 -

Warren whether she has evidence that Ashley was indeed involved in other investigations, to which C. Warren explained that she did, and that the BOP has continued to remain "insensitiv[e]" to Ashley's violent behavior, and that the BOP has allowed Ashley to -- subsequent to the murder -- become a porter at Victorville, where he was "busted for distributing heroin." Tr. at 42:15-43:15 (Lowry). Further, C. Warren then indicated that she was concerned that the "two seperatees listed" on R. Warren's report were "foot soldiers for Ashley," thus causing her to imagine a body of discovery that would develop information regarding the BOP's knowledge not only of Ashley's violent behavior himself, but also of his ability to orchestrate violent occurrences around the facility. Tr. at 44:3-14 (Lowry).

The United States, once more, objected to discovery of such information regarding Ashley's past violent behavior while incarcerated, because "it's a motion to dismiss based on discretionary function. [Y]ou know these allegations are made in the complaint. Our motion to dismiss does not challenge those allegations for purposes of the discretionary function." Tr. at 44:25-45:4 (Keegan). The United States stated that it made this argument because, even if the Court assumed C. Warren's factual version, it would still win. See Tr. at 45:7-10 (Court, Keegan). The Court thus ended argument regarding the allegations premised in R. Warren's separation order. See Tr. at 45:17-23 (Court).

Next, the Court addressed the issue why R. Warren was designated at Victorville II, a medium security facility, and the United States explained that "it is a public policy analysis, [the BOP is] balancing their resources, the population, all varieties." Tr. at 46:1-3 (Keegan). In this case, the United States explained, population control lead to this particular designation, and the BOP "made the professional judgment decision to send him to a medium security prison," and case law from "appellate courts from across the country have found that that is a discretionary

decision that falls within the discretionary function exception for the FTCA."  Tr. at 46:9-15 (Keegan).  C. Warren then responded to the United States argument, contending that "the initial placement like that would probably be where the Bureau of Prisons discretionary authority was at its strongest," but that

> some courts have [allowed] challenges to placement if the BOP . . . acted beyond the scope of its discretion when it applied the management variable.  And once again, without the discovery we have BOP's you know claim that this was done to because of population reasons.  But we don't have anything other than the affidavit to back that up.

Tr. at 47:6-12 (Lowry).  C. Warren also explained that, here, the inmates at Victorville II would get the list of incoming inmates, and then use the prison library to run Google searches of the incoming inmates to ascertain their convictions' nature.  See Tr. at 48:18-49:9 (Lowry).  Thus, C. Warren argued that

> I think the open question is how they get the list of names to be prepared for him when he arrived is an open question.  It just speaks again to the underlying problem of the BOP not really keeping this kind of information confidential and then what did the BOP learn in the course of that investigation of who was . . . shot calling Mr. Warren's demise.

Tr. at 49:9-16 (Lowry).  At this point, the United States argued C. Warren

> keeps going back to even if it is a discretionary function analysis if they do it if they don't undertake that analysis or they're negligent in their analysis, I hear plaintiff saying that it's their position and that takes it outside of the discretionary function exception.  And I think the Tenth Circuit has made it very clear that the Court is not to look at the actual analysis that took place.  The question is whether the action or decision is susceptible to policy analysis.

Tr. at 50:2-11 (Keegan).  C. Warren agreed only to an extent, however, responding that the

> question is[,] is the conduct susceptible to a policy analysis, and that's where I think the Federal Court in Shansky that I've cited throughout the day goes . . . it's outside the discretionary exception to the Tort Claims Act[,] it's looking at the second part of the test whether the conduct is susceptible to a policy driven analysis.  So I agree with the standard that applies as articulated by the Government.

Tr. at 50:22-51:5 (Lowry).

The Court then turned argument to the allegations that the BOP staff failed to securely tighten Ashley's waist chains and discussed with the United States transportation regulations the BOP applies when taking inmates on escort visits, which regard funerals or medical appointments. See Tr. at 51:12-25 (Keegan, Court). The United States indicated that, although such a regulation did not directly apply to transportation between BOP facilities, it was the closest that might apply when considering transferring inmates like Ashley. See Tr. at 52:15-16 (Keegan). The United States also pointed to a "bus order that applies, essentially to I believe the b[u]s drivers that are transporting individuals to the different facilities," but indicated that order is a sensitive document which the United States would need to disclose under a protective order. Tr. at 52:17-19 (Keegan). The United States then provided a redacted copy of the order to the Court, and indicated willingness to enter into a protective order and disclose the bus order to C. Warren's counsel as well; nonetheless, the United States contended that there were no regulations removing discretion from the BOP staff with respect to this allegation. See Tr. at 53:10-14 (Keegan). The United States further explained that:

> [T]here are no specific requirements for restraints for prisoners in holding cells. There is a requirement that . . . those that have been strip searched are placed in one holding cell versus those who have not yet been searched are placed in a separate holding cell. But there are no requirements about restraining them in holding cells. And when prisoners are restrained there are no requirements about how tight they are or how to fasten them or what type of restraints should be used in this area.

Tr. at 54:10-20 (Keegan).

C. Warren then responded and argued that this communal holding cell was near an airstrip, and that, although the bus order and the escort orders were likely inapplicable, the nature of inmate-air transfer at this particular facility likely would result in more stringent regulations

regarding, perhaps, waist chain tightness.  See Tr. at 55:9-56:8 (Lowry).  Pointing to the Davis Aff., C. Warren then argued that, "for high security inmate[s] such as Mr. Ashley, the staff must use at least handcuffs a Martin chain and leg irons," and further that, according to the Affidavit of Derek Eber (executed September 21, 2016), filed September 23, 2016 (Doc. 39-5)("Eber Aff."), "all inmates who[se] custody level is max will be restrained with a black box."  Tr. at 56:13-25 (Lowry).   Accordingly, C. Warren -- once more -- argued that, absent further discovery, she "is not operating with sufficient knowledge to really understand this process," and she has "never been able to talk to anybody who was actually you know in this particular holding cell because of the lack of discovery to know you know what the protocols were either from the BOP's point of view or from the inmate's point of view."  Tr. at 57:1-6 (Lowry).  Additionally, C. Warren maintained that, here:

> I could see . . . that at least a colorable claim [from] at least what we know about Ashley's history.  He's being sent out of the Victorville . . . medium level prison system to a maximum level security because he's a threat to any inmates like Mr. Warren who happens to have [a] sex offense.  So it seems likely that he would have been classified as a max, and perhaps should have been in a black boxes but even setting that aside, Your Honor, and this comes back to how do we analyze the discretionary function exception, . . . what I've heard is everyone say is well, there is no doubt that he would have to be in some kind of restraints but it would be discretionary of how to apply those restraints.  And again if you accept the fact that he needed to be restrained and we leave . . . did that mean the full body restraints or in addition to that . . . the black box, how [do] you apply those restraints . . .  I don't think . . . we come back into the two step process.  The Government has made a decision to apply restraints to people [and] once its made that decision I don't think, it's nondiscretionary that they need to be applied appropriately so that person's safety threat is neutralized . . . .

Tr. at 57:6-58:4 (Lowry).  Thus, C. Warren argued, "even if you could say that something is discretionary, do you apply restraints or not, I mean once you made the decision to apply restraints they have to be applied in a safe and secure manner to effectuate the purpose of applying restraints."  Tr. at 58:12-16 (Lowry).

> What I'm suggesting, Your Honor is there is no policy consideration that's worthy of the Court's detailed analysis of, gee, is the Government concerned with you know, how tight this particular device is?  I mean, the purpose of the device [is] to be tight enough to make sure that inmate can't hurt anyone else.  And so the question is either not a policy decision of how t[ight] chain should or shouldn't be and whether this particular guard was exercising sound discretion on how tight it was I mean, there is a decision made by the officials to apply those restraints.  They need to be applied correctly.  And the negligent application of those restraints doesn't lend itself to a policy consideration that the two part analysis is designed to protect.

Tr. at 58:22-59:12 (Lowry).  Thus, the operative inquiry in C. Warren's belief is whether "this defense of discretionary function becomes so attenuated from public policy grounds that it's just no longer viable."  Tr. at 59:19-21 (Lowry).

The United States then responded that "[t]here is a public policy analysis that would take place in terms of how tight you would apply these restraints," and that proposition is evidenced by the existence of various lawsuits across the country regarding the opposite argument -- that handcuffs are being applied too tight.  Tr. at 60:13-15 (Keegan).  Indeed, according to the United States, the Tenth Circuit has held that "when the relevant law leaves room for officials to exercise policy oriented discretion in a particular area, that discretion will be protected even with regard to what may seem to be the details of implementation."  Tr. at 60:21-25 (Keegan).  Accordingly, the United States contended that, as the Eleventh Circuit has held, "the manner of restraining a prisoner does involve the balancing of public policy considerations such as the individual prisoner's personal integrity with the safety of those around them, I don't think there is any question that there is not a specific order, mandatory directive with regard to restraining the prisoners."  Tr. at 61:9-16 (Keegan).

The United States next addressed C. Warren's category of allegation pertaining to the "physical layout, the requirement that all areas be visible and there is a requirement about frequently inspecting."  Tr. at 62:1-3 (Keegan).  According to the United States, however, there

is no allegation that the physical layout did not comply with that regulation and that, instead, C. Warren's allegations suggest only that there was no BOP staff watching this communal holding cell at the time of the murder. <u>See</u> Tr. at 62:3-17 (Keegan). The United States explained that the nonspecific language in these directives to frequently inspect certain areas entailed only just that -- to frequently inspect the areas, and "when they do that it's discretionary based on [the] balancing of resources and the . . . number of guards and where those guards need to be posted and what they need to be doing at that particular time." Tr. at 63:1-4 (Keegan).

C. Warren then addressed the Court and indicated that she had nearly no familiarity with the layout of the inmate transfer area, and that her allegation was not, for example, that there was a "line of sight" violation, but primarily that the "holding cell was left unattended." Tr. at 64:9-22 (Lowry). That is, C Warren contended, if "there had been somebody watching," the murder would not have occurred. Tr. at 64:12-16 (Court). C. Warren then hypothesized that discovery would uncover certain post orders, which are institutionally devised orders for a particular correctional officer's job in a particular area at the facility, which might cover the requisite attention owed to these communal holding cells in the inmate transfer area. <u>See</u> Tr. at 64:24-65:18 (Lowry). C. Warren made that argument, in part, because C. Warren maintained that there is

> this program statement [that] clearly lays out [that] physically. . . the holding cells need to be situated that staff has visual contact at all times. And even goes further than that. It says if for any reason, visual contact is impaired by some kind of physical impediment the alternative such as mirrors or camera equipment would be implemented. <u>And I think the clear import of that kind of directive is that you're supposed to have line of site [sic] on the holding cell at all times to prevent altercations</u> just like the one that [caused] Mr. Warren's death.

Tr. at 65:19-66:5 (Lowry)(emphasis added). Thus, C. Warren contended:

> [W]e articulated in the complaint [that] a cell that was unattended of . . . this [type] is particularly problematic when you have an individual like Mr. Ashley

> who is known to . . . attack people like Mr. Warren at the drop of a hat, and [BOP]
> knew Mr. Warren was susceptible and they knew Mr. Ashley was hostile, and
> leaving them unattended in the face of a regulation like this, it's a
> nondiscretionary act.

Tr. at 69:24-70:8 (Lowry).  C. Warren thus argues that the BOP didn't have the discretion to

leave the cell unattended.  See Tr. at 69:24-70:8 (Lowry).  C. Warren next argued that, should

discovery be had into whether post orders regarding supervision of the communal holding cell

exist, such a post order would have the equivalent power, in the context of the FTCA's

discretionary function exception, of a regulation or program statement.  See Tr. at 70:9-13

(Court, Lowry).  According to C. Warren, the directive of the warden would hold equivalent

power in this context.  See Tr. at 71:18-25 (Court, Lowry).  The United States disagreed, in

theory, however, that the post order would carry the sufficient authority to remove a BOP

official's discretion, and analogized to the United States Forest Service context where "there is a

Forest Service manual and they have directives and there is case law saying that like a letter that

gives an order is not, would not be considered [under] the discretionary function and would not

be considered a mandatory directive."  Tr. at 75:1-6 (Keegan).  The United States also did not

consider a warden's oral order to have the sufficient authority in this context.  See Tr. at 76:6-12

(Keegan).

> The Court then addressed the parties and suggested that
>
> it doesn't look like I need to allow the motion to amend at this point since Ms.
> Keegan is saying I can use all the facts and allegations in there to write the
> factual section as to what you're alleging can assume those facts to be true.  Do
> you agree with that?

Tr. at 80:11-16 (Court).  C. Warren responded by stating that she agreed, in principle, but that

another issue was C. Warren and the United States' inability, as of the date of the hearing, to get

together so that C. Warren could review certain items of agreed-upon discovery that might help

her further substantiate his Motion to Amend and refute the MTD.  See Tr. at 80:17-81:7
(Lowry).  C. Warren then posited that she would hopefully supplement her pleadings after
reviewing the discovery with the United States, and stated:

> And without the benefit of discovery, you know, this is a bit of a chicken and egg
> problem for the plaintiff, and what I'd like to do is you know, look at discovery
> and supplement the record for the Court so the Court can have a[] better
> understanding of the universe of, the orders and the directives from the Bureau of
> Prisons that might have been in place that could have been violated so we could
> better focus the Court's attention to the application of the discretionary function
> exception.

Tr. at 80:17-81:7 (Lowry).  The Court then asked the United States:

> If I end up finding some category here survives the discretionary function
> exceptions.  Say it's the line of sight.  The visual watching of the holding cell or
> something, do you then have any opposition to the amend[ed] complaint as long
> as it strips out other theories that I say are barred, do you have any problem then
> allowing Mr. Lowry to amend the complaint to give his best shot and then going
> forward with that theory?

Tr. at 81:8-17 (Court).   The United States replied: "Your Honor the United States['] total
objection to the amended complaint was that it fell within the discretionary function exception.
So to the extent the Court rules otherwise then we have no objection to the amended complaint."
Tr. at 81:18-22 (Keegan).  C. Warren thus concluded, asking the Court to not make a decision
before he could supplement his pleadings after reviewing the discovery with the United States,
stating: "Your Honor, is that frankly that we don't want the Court rushing into a decision on this
discretionary function exception when there may be wells of discovery that would help enlighten
the Court as to what the correct decision on that issue may be."  Tr. at 83:4-10 (Lowry).  The
Court, in response, stated:

> I well, let's do this:  Let's see where y'all get on your discussions.  If you run into
> problems, can you go ahead and contact Ms. Wild.  I'll see where I am on the
> opinion, I'll see where my thinking is, and you know, I may get on the phone with
> you and/or ask you to come over and see where you [are.]  I won't shut it down
> right at the present time but I'm not ordering anything either.  So let me sort of get

into the opinion and the get a little bit better footing as to what I think I'm going
to do on these categories and then maybe at that point if you throw a concrete
example at me, I may be able to respond[] a little better yeah or nay about
discovery.

Tr. at 83:10-23 (Court).

## LAW REGARDING RULE 12(b)(1)

"Federal courts are courts of limited jurisdiction; they are empowered to hear only those

cases authorized and defined in the Constitution which have been entrusted to them under a

jurisdictional grant by Congress." Henry v. Office of Thrift Supervision, 43 F.3d 507, 511 (10th

Cir. 1994)(Barrett, J.)(citations omitted).  A plaintiff generally bears the burden of demonstrating

the court's jurisdiction to hear his or her claims.  See Steel Co. v. Citizens for a Better Env't, 523

U.S. 83, 104 (1998)(Scalia, J.)("[T]he party invoking federal jurisdiction bears the burden of

establishing its existence.").  Rule 12(b)(1) allows a party to raise the defense of the court's "lack

of jurisdiction over the subject matter" by motion.  Fed. R. Civ. P. 12(b)(1).  The Tenth Circuit

has held that motions to dismiss for lack of subject-matter jurisdiction "generally take one of two

forms: (1) a facial attack on the sufficiency of the complaint's allegations as to subject-matter

jurisdiction; or (2) a challenge to the actual facts upon which subject matter jurisdiction is

based." Ruiz v. McDonnell, 299 F.3d 1173, 1180 (10th Cir. 2002)(VanBebber, J.).

On a facial attack, a plaintiff is afforded safeguards similar to those provided in
opposing a rule 12(b)(6) motion: the court must consider the complaint's
allegations to be true.  See Ruiz v. McDonnell, 299 F.3d at 1180; Williamson v.
Tucker, 645 F.2d 404, 412 (5th Cir. 1981).  But when the attack is factual, a
district court may not presume the truthfulness of the complaint's factual
allegations.  A court has wide discretion to allow affidavits, other documents, and
a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule
12(b)(1).  In such instances, a court's reference to evidence outside the pleadings
does not convert the motion to a Rule 56 motion.

Alto Eldorado Partners v. City of Santa Fe, 2009 WL 1312856, at *8-9 (D.N.M. 2009)(Browning, J.)(citations omitted)).  The United States Court of Appeals for the Fifth Circuit has stated:

> [T]he trial court may proceed as it never could under 12(b)(6) or Fed. R. Civ. P. 56.  Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction -- its very power to hear the case -- there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case.  In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.

Williamson v. Tucker, 645 F.2d 404, 412-13 (5th Cir. 1981)(Randall, J.)(quoting Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977)).

When making a rule 12(b)(1) motion, a party may go beyond the allegations in the complaint to challenge the facts upon which jurisdiction depends, and may do so by relying on affidavits or other evidence properly before the court.  See New Mexicans for Bill Richardson v. Gonzales, 64 F.3d 1495, 1499 (10th Cir. 1995)(Brorby, J.); Holt v. United States, 46 F.3d 1000, 1003 (10th Cir. 1995)(Baldock, J.).   In those instances where the parties go beyond the pleadings, a court's reference to evidence outside the pleadings does not necessarily convert the motion to a rule 56 motion for summary judgment.  See Holt v. United States, 46 F.3d at 1003 (citing Wheeler v. Hurdman, 825 F.2d 257, 259 n.5 (10th Cir. 1987)(Anderson, J.)).  Where, however, the court determines that jurisdictional issues raised in a rule 12(b)(1) motion are intertwined with the case's merits, the court should resolve the motion either under rule 12(b)(6) or rule 56.   See Franklin Sav. Corp. v. United States, 180 F.3d 1124, 1129 (10th Cir. 1999)(Murphy, J.); Tippett v. United States, 108 F.3d 1194, 1196 (10th Cir. 1997)(Briscoe, J.). "When deciding whether jurisdiction is intertwined with the merits of a particular dispute, 'the underlying issue is whether resolution of the jurisdictional question requires resolution of an

aspect of the substantive claim.'"  Davis ex rel. Davis v. United States, 343 F.3d 1282, 1296

(10th Cir. 2003)(Hartz, J.)(quoting Sizova v. Nat'l Inst. of Standards & Tech., 282 F.3d 1320,

1324 (10th Cir. 2002)(Seymour, J.)).

## LAW REGARDING THE FTCA

As with any jurisdictional issue, the party bringing the suit against the United States bears

the burden of proving that Congress has waived sovereign immunity.  See James v. United

States, 970 F.2d 750, 753 (10th Cir. 1992).  It is "axiomatic that the United States may not be

sued without its consent and that the existence of consent is a prerequisite for jurisdiction."

United States v. Mitchell, 463 U.S. 206, 212 (1983).  "Challenges to jurisdiction can . . . be

raised at any time prior to final judgment."  Grupo Dataflux v. Atlas Global Group, L.P., 541

U.S. 567, 571 (2004)(citing Capron v. Van Noorden, 6 U.S. (2 Cranch) 126 (1804)).

The terms of the United States' consent define the parameters of federal court jurisdiction

to entertain suits brought against it.  See United States v. Orleans, 425 U.S. 807, 814 (1976);

Ewell v. United States, 776 F.2d 246, 248 (10th Cir. 1985).  When the United States waives its

immunity from suit, a court should neither narrow the waiver nor "take it upon [itself] to extend

the waiver beyond that which Congress intended."  Smith v. United States, 507 U.S. at 203

(quoting United States v. Kubrick, 444 U.S. 111, 117-18 (1979)).

In 1948, Congress enacted the FTCA, which waives the United States' sovereign

immunity for certain torts that federal employees commit.  See FDIC v. Meyer, 510 U.S. 471,

475 (1994).  Congress waived sovereign immunity only for certain torts that United States

employees cause while acting within the scope of their office or of their employment.  See 28

U.S.C. § 1346(b).

1.     <u>**Exhaustion Requirements**</u>.

There are certain procedural requirements in suing the United States under the FTCA to which a plaintiff must strictly adhere before a district court can exercise jurisdiction.  The FTCA's jurisdictional statute provides:

> An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have <u>first presented the claim</u> to the appropriate Federal agency and his claim shall have been <u>finally denied by the agency</u> in writing and sent by certified or registered mail.

28 U.S.C. § 2675(a)(emphasis added).  This statute "requires that claims for damages against the government be presented to the appropriate federal agency by filing (1) a written statement sufficiently describing the injury to enable the agency to begin its own investigation, and (2) a sum certain damages claim."  <u>Estate of Trentadue ex rel. Aguilar v. United States</u>, 397 F.3d 840, 852 (10th Cir. 2005)(Tymkovich, J.)(quoting <u>Bradley v. United States ex. rel. Veterans Admin.</u>, 951 F.2d 268, 270 (10th Cir. 1991)(Anderson, J.)).

"[A] claim should give notice of the underlying facts and circumstances 'rather than the exact grounds upon which plaintiff seeks to hold the government liable.'"  <u>Staggs v. United States ex rel. Dep't of Health and Human Servs.</u>, 425 F.3d 881, 884 (10th Cir. 2005)(McConnell, J.)(quoting <u>Estate of Trentadue ex rel. Aguilar v. United States</u>, 397 F.3d at 853).  The Tenth Circuit has added that "the FTCA's notice requirements should not be interpreted inflexibly."  <u>Estate of Trentadue ex rel. Aguilar v. United States</u>, 397 F.3d at 853.  Whether a plaintiff's administrative claim is sufficient to meet 28 U.S.C. § 2675(a)'s notice requirement is a question of law.  <u>See</u> <u>Staggs v. United States ex rel. Dep't of Health and Human Servs.</u>, 425 F.3d at 884.

2.      **Filing Deadlines**.

The Tenth Circuit recently observed:

[T]he FTCA has both an administrative-exhaustion requirement, set forth in 28
U.S.C. § 2675(a), and a statute of limitations, set forth in 28 U.S.C. § 2401(b).
Combined, these provisions act as chronological bookends to an FTCA claim,
marking both a date before which a claim may not be filed and a date after which
any filing is untimely.

Barnes v. United States, 776 F.3d 1134, 1139 (10th Cir. 2015)(Holmes, J.).   Once a tort claim

accrues against the United States, 28 U.S.C. § 2401 gives a claimant two years to present that

claim in writing to the appropriate federal agency.   See 28 U.S.C. § 2401(b)(explaining that

claim is "forever barred" unless presented within two years).   After submission of a written

claim, the agency usually has six months to reach a final disposition on the claim.   If the agency

denies the claim, the claimant has six months to file suit in federal court.   See 28 U.S.C. §

2401(b).

If the agency fails to make a final disposition of the claim within six months, the claimant

may "deem[]" that failure a "final denial of the claim," and proceed with his or her suit under the

FTCA.  28 U.S.C. § 2675(a).  In the Tenth Circuit, "(at least until there has been a final denial by

the relevant agency) there is no limit on when a plaintiff may file a lawsuit predicated on a

deemed denial."  Barnes v. United States, 776 F.3d at 1140-41.   An agency may "trigger[] §

2401(b)'s six-month limitations period through final denial of administrative FTCA claims after

a 'deemed denial.'"  Barnes v. United States, 776 F.3d at 1141.

3.      **Effect of Failure to Exhaust**.

"[A]s a general rule, a premature complaint cannot be cured through amendment, but

instead, plaintiff must file a new suit."  Duplan v. Harper, 188 F.3d 1195, 1199 (10th Cir. Okla.

1999)(internal quotation marks omitted).    This rule exists because "[a]llowing claimants

generally to bring suit under the FTCA before exhausting their administrative remedies and to cure the jurisdictional defect by filing an amended complaint would render the exhaustion requirement meaningless and impose an unnecessary burden on the judicial system." Duplan v. Harper, 188 F.3d at 1199.  Courts must dismiss these claims "without regard to concern for judicial efficiency."  Ruppert v. Aragon, 448 F. App'x 862, 863 (10th Cir. 2012)(O'Brien, J.)(unpublished).  Even the filing of an amended complaint may not serve to cure a prematurely filed original complaint.  See Stevens v. United States, 61 F. App'x 625, 627 (10th Cir. 2003)(Baldock, J.)(unpublished).

There is at least one limited exception to the general rule.  Duplan v. Harper recognizes an exception where the United States "expressly agreed" to the district court's decision to treat the amended complaint as a new action.  188 F.3d at 1199.  See Mires v. United States, 466 F.3d 1208, 1211 (10th Cir. 2006)(McConnell, J.)(finding new action where plaintiff "sought permission to file -- and, with the government's consent and district court's permission, did file -- an amended complaint").

### 4.      Definition of "Sufficient Notice".

Courts define "sufficient notice" based on the facts of each case before them.  In Estate of Trentadue ex rel. Aguilar v. United States, the United States contended that the plaintiffs' administrative claim was insufficient for notice of intentional infliction of emotional distress, because it was based on a theory that prison officials had murdered Trentadue, the inmate, and the allegations did not discuss the specific grounds on which the district court relied in awarding damages, "namely the government's treatment of the Trentadue family in the aftermath of his death and its actions in conducting an autopsy after claiming that no autopsy would be performed without prior approval."  397 F.3d at 852.  The Tenth Circuit disagreed, holding that the

"plaintiffs' administrative claim provided notice that [the United States Department of Justice] should investigate the prison officials' conduct."  397 F.3d at 853.  The Tenth Circuit reasoned that language within the administrative claim "gave DOJ notice of the facts and circumstances surrounding plaintiffs' emotional distress claim and, moreover, is consistent with the plaintiffs' subsequent allegations in their amended complaints."  397 F.3d at 853.

The Tenth Circuit contrasted Estate of Trentadue ex rel. Aguilar v. United States with Dynamic Image Techs., Inc. v. United States, 221 F.3d 34 (1st Cir. 2000)(Selya, J.), where the United States Court of Appeals for the First Circuit held that the plaintiff's administrative claim did not put the agency on notice that it should have investigated the potentially tortious conduct, because the plaintiff's administrative claims were for "misrepresentation, libel, slander, contractual interference, and discrimination," and the amended claims for false arrest arose out of two separate incidences.  221 F.3d at 40.  The First Circuit stated: "Though prolix, that claim did not contain so much as a hint about the alleged false arrest or the incident that spawned it."  221 F.3d at 40.  The First Circuit thus concluded that, "regardless of the labels employed in the amended complaint, that complaint, in substance, seeks recovery based solely on an incident that was not mentioned in the plaintiffs' administrative claim."  221 F.3d at 40 (emphasis omitted).

In Glade ex rel. Lundskow v. United States, a man receiving mental health treatment at a United States Veterans Administration facility alleged that his therapist worsened his condition by initiating a sexual relationship with him.  See 692 F.3d at 720.  He filed a notice of claim with the VA that "does not mention a failure of anyone to use due care besides the therapist."  Glade v. United States, 692 F.3d 718, 722 (7th Cir. 2012).  The Seventh Circuit, reviewing the notice, commented that "reading the administrative claim you would think the plaintiff was just seeking damages under a theory of respondeat superior against an employer for an employee's battery,

and we know that such a theory won't fly under the Tort Claims Act."  692 F.3d at 722.  The

plaintiff recognized this problem before filing his complaint and thus asserted a "special

relationship" theory of liability instead.  692 F.3d at 723.  The Seventh Circuit affirmed the

district court's decision to dismiss the suit, explaining:

> The administrative claim need not set forth a legal theory, but it must allege facts
> that would clue a legally trained reader to the theory's applicability.  *Palay v.*
> *United States,* 349 F.3d 418, 425-26 (7th Cir. 2003); *Murrey v. United States,* 73
> F.3d 1448, 1452-53 (7th Cir. 1996).  The plaintiff's claim didn't do that.  The
> legally trained reader would assume that the plaintiff simply was unaware that the
> mere fact of a battery by a VA employee would not impose liability on the
> employer.  We're about to see that the "special relationship" tort theory advanced
> in the plaintiff's complaint (as distinct from the administrative claim) is outside
> the bounds of plausibility -- hardly the sort of theory that the VA's legal
> department should have guessed would be the ground of a lawsuit.

Glade v. United States, 692 F.3d at 722-23.

### 5.    **Medical Cases.**

Some courts have required the claimant to provide extensive information about the

injuries alleged in the complaint.  In Staggs v. United States ex rel. Dep't of Health and Human

Servs., the Tenth Circuit held that the plaintiff's administrative claim, accusing the hospital of "a

substantial departure from the standard of care and . . . negligent management of her pregnancy

and labor," was not sufficient to put the agency on notice that it should have investigated a claim

based on lack of informed consent.  425 F.3d at 884.  The Tenth Circuit stated that "[n]othing in

Staggs' administrative claims suggests that Staggs consented to a course of treatment or

remained on such a course without being informed of her options and risks."  425 F.3d at 884.

The Tenth Circuit reasoned that, "given the length and factual specificity of Staggs' description

of [the administrative] claim," and the claim's failure to "mention [] consent or a suitable

synonym, [the government agency] could have reasonably concluded that a claim of lack of

informed consent was not intended and that an investigation into lack of informed consent was unnecessary."  425 F.3d at 885.

Ham v. United States, a similarly restrictive case, involved a prisoner's claims against three dentists who attempted to fix a damaged tooth.  See 2008 WL 818197, at *4.  The plaintiff's administrative claim focused on the first two dentists' alleged errors, mentioning the third dentist only in passing.  The complaint, however, focused on the third dentist's refusal to repair, rather than extract, the tooth.  See 2008 WL 818197, at *4.  Although that court said that the claim "encompasses any cause of action fairly implicit in the facts," it dismissed the complaint, because it "offers the first notice that [the third dentist's] actions were legally objectionable."  2008 WL 818197, at *4.

In Palay v. United States, 349 F.3d 418 (7th Cir. 2003)(Rovner, J.), a prisoner sent a notice of a claim charging the Bureau of Prisons with failing to protect him from violence at the hands of fellow inmates and describing his injuries, but omitting "facts suggesting that the prison medical staff had treated him inappropriately."  349 F.3d at 426.  The prisoner later brought suit on a medical malpractice theory.  The Seventh Circuit held that, although it was a "close[] question," the prisoner failed to provide sufficient notice, because he "did not include facts in his [notice] from which a legally sophisticated reader might have discerned that he had received inadequate medical treatment."   349 F.3d at 427 (distinguishing this standard from the Fifth Circuit's more liberal standard in Frantz v. United States, 29 F.3d 222, 224-25 (5th Cir. 1994)).  See Bethel v. U.S., ex rel. Veterans Admin. Med. Ctr. of Denver, Colorado, 495 F. Supp. 2d at 1124 (holding that plaintiff's treatment-based claim, which focused on medical malpractice, was insufficient notice of subsequent negligent supervision argument).

Other courts have been more generous.  In Coffey v. United States, 906 F. Supp. 2d 1114 (D.N.M. 2012)(Browning, J.), the Court determined that a ninety-word claim that alleged that a prisoner's "medical condition was ignored, that he was denied medication, and that he was transferred by the [United States Bureau of Indian Affairs]" provided sufficient notice of his mother's negligent screening and transfer theories.  906 F. Supp. 2d at 1153-54.  The Court concluded that the claim, despite its brevity, "gave the BIA notice of the facts and circumstances surrounding [plaintiff Coffey's deceased son] Crutcher's medical needs and subsequent death [sufficient] to provide the BIA notice that it should have investigated the underlying conduct." 906 F. Supp. 2d at 1154.

## LAW REGARDING SOVEREIGN IMMUNITY AND THE FTCA

"The United States cannot be sued without its consent."  Garcia v. United States, 709 F. Supp. 2d 1133, 1137 (D.N.M. 2010)(Browning, J.).  "Congressional consent -- a waiver of the traditional principle of sovereign immunity -- is a prerequisite for federal-court jurisdiction." Garcia v. United States, 709 F. Supp. 2d at 1137-38.  "The plaintiff bears the burden of proving that Congress has waived sovereign immunity for all of his claims."  Garcia v. United States, 709 F. Supp. 2d at 1138.    Accord Bork v. Carroll, 449 F. App'x 719, 721 (10th Cir. 2011)(unpublished)("So it is that a plaintiff  seeking to invoke the jurisdiction of the federal courts bears the burden of identifying an applicable statutory waiver of sovereign immunity when challenged to do so."); Summa v. United States, 936 F.2d 584, 1991 WL 114638, at *3 (10th Cir. 1991)(unpublished table decision)(holding in an FTCA case that the "Plaintiffs bore the burden of proving that the district court had subject matter jurisdiction over their claims" (citing Miller v. United States, 710 F.2d 656, 662 (10th Cir. 1983)).

1.      **General Principles of Sovereign Immunity**.

It is "axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." United States v. Mitchell, 463 U.S. 206, 212 (1983)(citations omitted). Accord FDIC v. Meyer, 510 U.S. at 475; United States v. Testan, 424 U.S. 392, 399 (1976); United States v. Sherwood, 312 U.S. 584, 586 (1941). The law generally places the burden of proving federal jurisdiction on the proponent of jurisdiction, and the party bringing suit against the United States thus similarly bears the burden of proving that sovereign immunity has been waived. See James v. United States, 970 F.2d 750, 753 (10th Cir. 1992). A waiver of sovereign immunity cannot be implied and must be unequivocally expressed. See United States v. Nordic Vill., Inc., 503 U.S. 30, 33-34 (1992); United States v. Mitchell, 445 U.S. 535, 538 (1980); United States v. Murdock Mach. & Eng'g Co. of Utah, 81 F.3d 922, 930 (10th Cir. 1996).

2.      **The FTCA**.

The FTCA waives the United States' sovereign immunity in certain specific tort actions against the United States for money damages. See Romanach v. United States, 579 F. Supp. 1017, 1019 (D.P.R. 1984)(Laffitte, J.) Congress has explicitly provided, however, that the only proper party in an action under the FTCA is the United States. See 28 U.S.C. § 2679(a); Romanach v. United States, 579 F. Supp. at 1018 n.1 (holding that no suit under the FTCA may lie against any agency of the United States eo nomine); Painter v. FBI, 537 F. Supp. 232, 236 (N.D. Ga. 1982)(Forrester, J.)(holding that "[t]he FBI may not be sued eo nomine").

In enacting the FTCA, Congress defined the terms and conditions under which the United States may be sued in tort. 28 U.S.C. § 1346(b) provides, in pertinent part:

> [T]he district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages accruing on and after

> January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be held liable to the claimant in accordance with the law of the place where the act or omission occurred.

A companion FTCA section provides that the United States is liable "in the same manner and to the same extent as a private individual under like circumstances."  28 U.S.C. § 2674.  "The law of the place where the alleged negligent conduct took place determines the scope of employment under the FTCA."  Garcia v. United States, 2010 WL 2977611, at *18 (D.N.M. 2010)(Browning, J.)(citing 28 U.S.C. § 1346(b); Richards v. United States, 369 U.S. 1, 9 (1962); Williams v. United States, 350 U.S. 857, 857 (1955); Henderson v. United States, 429 F.2d 588, 590 (10th Cir. 1970)).

The Tenth Circuit has emphasized that all dismissals for lack of jurisdiction, including those for a failure to establish a waiver of sovereign immunity under the FTCA, should be without prejudice.  See Mecca v. United States, 389 F. App'x 775, 780 (10th Cir. 2010).  It has explained: "A longstanding line of cases from this circuit holds that where the district court dismisses an action for lack of jurisdiction . . . the dismissal must be without prejudice."  Mecca v. United States, 389 F. App'x at 780 (quoting Brereton v. Bountiful City Corp., 434 F.3d 1213, 1216 (10th Cir. 2006)).  The Tenth Circuit held in Mecca v. United States that the district court improperly dismissed with prejudice the plaintiff's FTCA claims after it concluded that it lacked jurisdiction over those claims.  See 389 F. App'x at 780-81 ("Here, because the district court found itself without jurisdiction over the FTCA claims, dismissal should have been entered without prejudice, even if the court deemed further amendment futile.  We therefore remand with instructions to enter dismissal of these claims without prejudice.").

3.      **Scope of Liability Under the FTCA**.

The FTCA waives the United States' sovereign immunity for certain negligence claims, but it does so only if a private person, performing the same act as the United States, would be liable under the governing state law.  See 28 U.S.C. § 2674 ("The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances . . . .").  "[T]hese sections ensure that the United States is placed in the same position as a private individual by rendering the United States liable for the tortious conduct of its employees if such conduct is actionable in the state in which the United States' action or inaction occurred."  Cortez v. EEOC, 585 F. Supp. 2d 1273, 1284 (D.N.M. 2007)(Browning, J.).   "The FTCA's waiver of sovereign immunity is limited, however."  Cortez v. EEOC, 585 F. Supp. 2d at 1284.  "If the claim does not fall within the FTCA's express provisions, or if it falls within one of its exceptions, the claim is not cognizable under the FTCA, and the court must deny relief."  Cortez v. EEOC, 585 F. Supp. 2d at 1284 (citing Williams v. United States, 50 F.3d 299, 304-05 (4th Cir. 1995)).

a.      **Liability Under the Same Circumstances Versus Like Circumstances**.

The Supreme Court of the United States has rejected a reading of the FTCA that would impose liability on the United States only "to the same extent as would be imposed on a private individual 'under the same circumstances.'"  Indian Towing Co. v. United States, 350 U.S. 61, 65 (1955)("The Government reads that statute as if it imposed liability to the same extent as would be imposed on a private individual 'under the same circumstances.' But the statutory language is 'under like circumstances[]' . . . .").  The FTCA did not spur "the creation of new causes of action but acceptance of liability under circumstances that would bring private liability into existence."  Feres v. United States, 340 U.S. 135, 141 (1950).  It is important for a court to

consider the liability of the United States under all the circumstances presented in the case as opposed to selectively considering only a few of the circumstances.  See Feres v. United States, 340 U.S. at 141-42.  The Supreme Court has illustrated:

> One obvious shortcoming in these claims is that plaintiffs can point to no liability of a "private individual" even remotely analogous to that which they are asserting against the United States.  We know of no American law which ever has permitted a soldier to recover for negligence, against either his superior officers or the Government he is serving.  Nor is there any liability "under like circumstances," for no private individual has power to conscript or mobilize a private army with such authorities over persons as the Government vests in echelons of command.  The nearest parallel, even if we were to treat "private individual" as including a state, would be the relationship between the states and their militia.  But if we indulge plaintiffs the benefit of this comparison, claimants cite us no state, and we know of none, which has permitted members of its militia to maintain tort actions for injuries suffered in the service, and in at least one state the contrary has been held to be the case.  It is true that if we consider relevant only a part of the circumstances and ignore the status of both the wronged and the wrongdoer in these cases we find analogous private liability.  In the usual civilian doctor and patient relationship, there is of course a liability for malpractice.  And a landlord would undoubtedly be held liable if an injury occurred to a tenant as the result of a negligently maintained heating plant.  But the liability assumed by the Government here is that created by "all the circumstances," not that which a few of the circumstances might create.  We find no parallel liability before, and we think no new one has been created by, this Act.  Its effect is to waive immunity from recognized causes of action and was not to visit the Government with novel and unprecedented liabilities.

Feres v. United States, 340 U.S. at 141-42 (footnotes omitted).

### b. Considering the Liability Under State Law of Private Actors Versus Governmental Actors.

The United States' liability is coextensive with that of private individuals under the respective States' law, even if comparable government actors would have additional defenses or additional obligations under that State's law.  See Ewell v. United States, 776 F.2d 246, 248-49 (10th Cir. 1985); Proud v. United States, 723 F.2d 705 (9th Cir. 1984)("But appellants overlook the fact that in enacting the FTCA, Congress -- not the Hawaii Legislature -- determined the tort liability of the United States.  And the FTCA specifically provides that the federal government's

- 67 -

tort liability is co-extensive with that of a private individual under state law."); Cox v. United States, 881 F.2d 893, 895 (10th Cir. 1989)(citing Proud v. United States with approval)("This and other courts have applied the same rationale in holding that the United States may invoke the protection of a [private] recreational use statute.").  The Tenth Circuit illustrated some of these same principles in Ewell v. United States:

> The main goal of the FTCA was to waive sovereign immunity so that the federal government could be sued as if it were a private person for ordinary torts. Congress was primarily concerned with allowing a remedy where none had been allowed.  There is no evidence that Congress was concerned with the prospect that immunities created solely for private persons would shield the United States from suit.  The Supreme Court, in United States v. Muniz, 374 U.S. 150 . . . (1963), considered whether it is appropriate to apply immunities created by state law to the United States when it is sued under the FTCA.  The Court was concerned with state laws that immunized prison officials from suits by prisoners and concluded that it is "improper to limit suits by federal prisoners because of restrictive state rules of immunity."  374 U.S. at 164 . . . . The immunity under consideration in that case applied to state, county and municipal prison officials.  Noting its decision in Indian Towing Co. v. United States, 350 U.S. at 65 . . . wherein the Court determined that federal liability had to be determined as if it were a private person and not as if it were a municipal corporation, it concluded that state law immunity applicable to state, county and municipal prison officials would not be applicable to a private person and, therefore, not applicable to the federal government in a suit under the FTCA.
>
> Thus, while immunities afforded state, county and municipal employees are not applicable to the federal government when sued under the FTCA, immunities created by state law which are available to private persons will immunize the federal government because it is liable only as a private individual under like circumstances.  It is evident, therefore, that the Utah district court was correct in granting the motion for summary judgment.

Ewell v. United States, 776 F.2d at 249.

In a unanimous decision, the Supreme Court recently reversed "a line of Ninth Circuit precedent permitting courts in certain circumstances to base a waiver" under the FTCA "simply upon a finding that local law would make a 'state or municipal entit[y]' liable."  United States v. Olson, 546 U.S. 43, 44 (2005)(internal citation omitted).  As the Supreme Court discussed in

United States v. Olson, the United States Court of Appeals for the Ninth Circuit based its

decision to find a waiver of liability under the FTCA on two principles:

> In this case, two injured mine workers (and a spouse) have sued the United States
> claiming that the negligence of federal mine inspectors helped bring about a
> serious accident at an Arizona mine.  The Federal District Court dismissed the
> lawsuit in part upon the ground that their allegations were insufficient to show
> that Arizona law would impose liability upon a private person in similar
> circumstances.  The Ninth Circuit, in a brief per curiam opinion, reversed this
> determination.   It reasoned from two premises. First, where "'unique
> governmental functions'" are at issue, the Act waives sovereign immunity if "'a
> state or municipal entity would be [subject to liability] under the law [. . .] where
> the activity occurred.'"   Second, federal mine inspections being regulatory in
> nature are such "'unique governmental functions,'" since "there is no private-
> sector analogue for mine inspections."   The Circuit then held that Arizona law
> would make "state and municipal entities" liable in the circumstances alleged;
> hence the FTCA waives the United States' sovereign immunity.

546 U.S. at 45 (alterations in original)(citations omitted).  The Supreme Court "disagree[d] with

both of the Ninth Circuit's legal premises."  United States v. Olson, 546 U.S. at 45.  Regarding

the first premise, the Supreme Court held:

> The first premise is too broad, for it reads into the Act something that is not there.
> The Act says that it waives sovereign immunity "under circumstances where the
> United States, if a private person," not "the United States, if a state or municipal
> entity," would be liable.  Our cases have consistently adhered to this "private
> person" standard. In Indian Towing Co. v. United States, this Court rejected the
> Government's contention that there was "no liability for negligent performance of
> 'uniquely governmental functions.'" It held that the Act requires a court to look to
> the state-law liability of private entities, not to that of public entities, when
> assessing the Government's liability under the FTCA "in the performance of
> activities which private persons do not perform." In Rayonier Inc. v. United
> States, the Court rejected a claim that the scope of FTCA liability for "'uniquely
> governmental'" functions depends on whether state law "imposes liability on
> municipal or other local governments for the negligence of their agents acting in"
> similar circumstances. And even though both these cases involved Government
> efforts to escape liability by pointing to the absence of municipal entity liability,
> we are unaware of any reason for treating differently a plaintiff's effort to base
> liability solely upon the fact that a State would impose liability upon a municipal
> (or other state governmental) entity. Indeed, we have found nothing in the Act's
> context, history, or objectives or in the opinions of this Court suggesting a waiver
> of sovereign immunity solely upon that basis.

United States v. Olson, 546 U.S. at 45-46 (citations omitted).

The Supreme Court rejected the Ninth Circuit's second premise based on the following

rationale:

> The Ninth Circuit's second premise rests upon a reading of the Act that is too narrow. The Act makes the United States liable "in the same manner and to the same extent as a private individual under like circumstances." As this Court said in *Indian Towing*, the words "'like circumstances'" do not restrict a court's inquiry to the same circumstances, but require it to look further afield. The Court there considered a claim that the Coast Guard, responsible for operating a lighthouse, had failed "to check" the light's "battery and sun relay system," had failed "to make a proper examination" of outside "connections," had "fail[ed] to check the light" on a regular basis, and had failed to "repair the light or give warning that the light was not operating." These allegations, the Court held, were analogous to allegations of negligence by a private person "who undertakes to warn the public of danger and thereby induces reliance." It is "hornbook tort law," the Court added, that such a person "must perform his 'good Samaritan' task in a careful manner."

United States v. Olson, 546 U.S. at 46 (alterations in original).

The Court has not located any Tenth Circuit decisions that have discussed the related

principles enunciated in United States v. Olson. The United States Court of Appeals for the

Third Circuit has since held, relying on United States v. Olson: "Under the FTCA, the federal

government can only be held liable for breaches of duties imposed on private, rather than state,

parties." DeJesus v. U.S. Dep't of Veterans Affairs, 479 F.3d 271, 283 n.9 (3d Cir. 2007). The

United States Court of Appeals for the Fifth Circuit has held, also relying on United States v.

Olson: "Because the federal government could never be exactly like a private actor, a court's job

in applying the standard is to find the most reasonable analogy. Inherent differences between the

government and a private person cannot be allowed to disrupt this analysis." In re FEMA Trailer

Formaldehyde Prod. Liab. Litig. (Miss. Plaintiffs), 668 F.3d 281, 288 (5th Cir. 2012)(citations

omitted).

According to one commentator, courts have generally had little difficulty in finding a

comparable factual analogy in the private sector for conduct in which the United States engages: "Although, as indicated above, courts have generally had little difficulty in finding sufficiently analogous private conduct, there have been exceptions, primarily in cases involving 'quasi-legislative' actions, such as administrative rulemaking, and in cases involving law enforcement officials, who, unlike private citizens, are required to make arrests in appropriate situations."  2 L. Jayson & R. Longstreth, Handling Federal Tort Claims § 9.08[1], at 9-219 (2011).  The Tenth Circuit has stated: "It is virtually axiomatic that the FTCA does not apply where the claimed negligence arises out of the failure of the United States to carry out a [federal] statutory duty in the conduct of its own affairs."  United States v. Agronics Inc., 164 F.3d 1343, 1345 (10th Cir. 1999).  It recognized that "[o]ther courts invoke the same rule by the shorthand expressions of immune 'quasi-legislative' or 'quasi-judicial' action."  United States v. Agronics Inc., 164 F.3d at 1345.

Thus, for example, courts have rejected FTCA claims premised upon such administrative/regulatory acts or omissions as (1) the Federal Aviation Administration's failure to take enforcement action against an entity not complying with federal laws and rules; (2) the United States Department of Agriculture's failure to prohibit the exportation of disease-exposed cattle; and (3) various agencies' noncompliance with proper rulemaking procedures.  See United States v. Agronics Inc., 164 F.3d at 1346 (citations omitted)(finding no FTCA waiver for "the unauthorized division of regulatory jurisdiction between two administrative agencies").

The Court examined the exceptions to the FTCA's waiver of sovereign immunity in Coffey v. United States, 906 F. Supp. 2d 1114 (D.N.M. 2012)(Browning, J.).  In that case, a plaintiff brought a wrongful death and negligence action against the Bureau of Indian Affairs based on its decision to contract with a county detention center.  See 906 F. Supp. 2d at 1121.

The United States argued against liability on the grounds that the detention center was an independent contractor and that the United States' decision to contract with it fell within the FTCA's discretionary-function exemption.  See 906 F. Supp. 2d at 1121. The Court agreed on both points.  See 906 F. Supp. 2d at 1121.  It explained that the BIA's decision to contract with the detention center was "a matter of the BIA's judgment and choice, which is susceptible to policy analysis," and thus protected under the discretionary function exemption.  906 F. Supp. 2d at 1157.  It added that the United States "is liable under the FTCA for the actions of its employees only," thereby prohibiting liability for the detention center's actions.  906 F. Supp. 2d at 1164.

## LAW REGARDING THE DISCRETIONARY FUNCTION EXCEPTION

The FTCA also contains several exceptions that preclude the United States' liability.  See 28 U.S.C. § 2680.  One of these exceptions is the discretionary function exception, which provides that the FTCA shall not apply to claims "based upon the exercise or performance or the failure to exercise or perform a discretionary-function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).  The Supreme Court has characterized § 2680(a) as the "boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals."  United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 808 (1984).

The exception must be strictly construed in the United States' favor.  See U.S. Dep't of Energy v. Ohio, 503 U.S. 607, 615 (1992)("Waivers of immunity must be strictly construed in favor of the sovereign and not enlarged beyond what the language requires.")(internal citations and quotation marks omitted).  Its application is a threshold jurisdictional issue in any case

brought under the FTCA.  See Johnson v. U.S. Dep't of Interior, 949 F.2d 332, 335 (10th Cir. 1991).

In Berkovitz, 486 U.S. at 531, the Supreme Court enunciated a two-prong analysis for determining when the FTCA's discretionary function exception applies.  See 486 U.S. at 536; Domme v. United States, 61 F.3d 787, 789-90 (10th Cir. 1995); Black Hills Aviation, Inc. v. United States, 34 F.3d 968, 972-73 (10th Cir. 1994); Kiehn v. United States, 984 F.2d 1100, 1102-03 (10th Cir. 1993).  First, the acts or omissions must be "discretionary in nature, acts that 'involve an element of judgment or choice.'"  United States v. Gaubert, 499 U.S. 315, 322 (1991)(quoting Berkovitz, 486 U.S. at 536).   Second, the conduct must be "based on considerations of public policy."  United States v. Gaubert, 499 U.S. at 323 (quoting Berkovitz, 486 U.S. at 537).  See Garling v. United States Environmental Protection Agency, 2017 WL 894432, at *3 (10th Cir. 2017).  In applying the Berkovitz analysis, the question of negligence is irrelevant: "When the government performs a discretionary function, the exception to the FTCA applies regardless of 'whether or not the discretion involved be abused.'"  Redman v. United States, 934 F.2d 1151, 1157 (10th Cir. 1991)(quoting 28 U.S.C. § 2680(a)).

Conduct is protected under the second prong of Berkovitz analysis if it was or could have been "'based on considerations of public policy.'"  Kiehn v. United States, 984 F.2d 1103, 1105 (10th Cir. 1993)(quoting Berkovitz, 486 U.S. at 537).  This principle is a result of the rule that the second prong requires that the challenged conduct must be, by its nature, "susceptible to policy analysis."  United States v. Gaubert, 499 U.S. at 325.  Where agency policy allows an employee to exercise discretion, there is a "strong presumption" that the acts authorized by the policy are grounded in public policy.  United States v. Gaubert, 499 U.S. at 324.  Where a plaintiff alleges a negligent omission, it is "'irrelevant whether the [omission] was a matter of

deliberate choice, or a mere oversight.'"   Kiehn v. United States, 984 F.2d at 1105 (internal quotation marks omitted).   "The failure to consider some or all critical aspects of a discretionary judgment does not make that judgment less discretionary and does not make the judgment subject to liability."   Kiehn v. United States, 984 F.2d at 1105.

The FTCA's discretionary function exception protects the challenged conduct if it involves judgment or choice, and is the kind of conduct that could be based on public policy. See United States v Gaubert, 499 U.S. at 324-325.   The two-prong test in Berkovitz applies equally to all government employees, regardless of their rank or position: "[I]t is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case."   United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. at 813.   See United States v. Gaubert, 499 U.S. at 325 ("Discretionary conduct is not confined to the policy or planning level."); United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. at 811 ("Where there is room for policy judgment and decision there is discretion.   It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable.")(internal quotations and citation omitted).

Generally, the discretionary function exception covers law enforcement and investigatory activity.   See Hobdy v. United States, 968 F.2d 20 (10th Cir. 1998)(Table), 1992 WL 149871, at *2.   For example, in Pooler v. United States, 787 F.2d 868 (3rd Cir.), cert. denied, 479 U.S. 849 (1986), the Third Circuit found the discretionary function exception covered alleged deficiencies in investigative methods that led to the plaintiff's arrest.   See Pooler v. United States, 787 F.2d at 871.   In so doing, the Third Circuit further stated: "Prosecutorial decisions as to whether, when and against whom to initiate prosecution are quintessential examples of governmental discretion

in enforcing the criminal law, and, accordingly, courts have uniformly found them to be immune under the discretionary function exception." Pooler v. United States, 787 F.2d at 871. This enforcement and investigatory discretion implicates policy factors on how to best achieve the agency's goals and mission under the statutes and regulations it is responsible for administering. See Kelly v. United States, 924 F.2d 355, 361-62 (1st Cir. 1991)(noting that decisions to investigate are at the core of law-enforcement activity and are protected by the exception); Doherty v. United States, 905 F. Supp. 54, 56 (D. Mass. 1995)(explaining that process of deciding how and when to seek a search warrant is grounded in policy considerations).

Certain aspects of an investigation may be considered non-discretionary if officials fail to follow specific agency mandates or directives governing their conduct. See Couzado v. United States, 883 F. Supp. 691, 694-95 (S.D. Fla. 1995), aff'd in Couzado v. United States, 105 F.3d 1389, 1395-97 (11th Cir. 1997)(affirming the imposition of liability upon the government pursuant to the FTCA, because Customs agent's failure to divulge important information and to cooperate with the Drug Enforcement Agency in executing the controlled delivery negligently compromised passengers' and the crew's safety and proximately caused the plaintiffs' injuries).

In Ortiz v. United States Border Patrol, 39 F. Supp. 2d 1321 (D.N.M. 1999)(Black, J.), the court noted that, "in the context of activities peculiar to law enforcement, some courts have established exceptions to the principle that the proper comparison in FTCA cases is to private, nongovernment individuals." 39 F. Supp. 2d at 1324. "However, these cases only serve to illustrate that there is a significant difference under the FTCA between 'private persons' and government employees, and that the primary inquiry is how a private person in similar circumstances would be treated under state law." 39 F. Supp. 2d at 1324. The Border Patrol agents in Ortiz v. United States Border Patrol "were not engaged in a function unique to law

enforcement when they stopped to render aid at the accident scene." 39 F. Supp. 2d at 1325. "Thus, a private analogue for their actions is readily available," and the Border Patrol was therefore liable for its agents' actions only to the extent that a private person, in the same circumstances, would be liable. 39 F. Supp. 2d at 1325.

## LAW REGARDING MOTIONS TO AMEND

"While Rule 15 governs amendments to pleadings generally, rule 16 of the Federal Rules of Civil Procedure governs amendments to scheduling orders." Bylin v. Billings, 568 F.3d 1224, 1231 (10th Cir. 2009)(citing Fed. R. Civ. P. 16(b)). When a court has not entered a scheduling order in a particular case, rule 15 governs amendments to a plaintiff's complaint. See Fed. R. Civ. P. 15. When a scheduling order governs the case's pace, however, amending the complaint after the deadline for such amendments implicitly requires an amendment to the scheduling order, and rule 16(b)(4) governs changes to the scheduling order. See Bylin v. Billings, 568 F.3d at 1231. Rule 15(a) of the Federal Rules of Civil Procedure provides:

> **(1) Amending as a Matter of Course.** A party may amend its pleading once as a matter of course within:
>
>> **(A)** 21 days after serving it, or
>>
>> **(B)** if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under rule 12(b), (e), or (f), whichever is earlier.
>
> **(2) Other Amendments.** In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires.

Fed. R. Civ. P. 15(a)(bold in original). Further, the local rules provide that, with respect to motions to amend a pleading, "[a] proposed amendment to a pleading must accompany the motion to amend." D.N.M.LR-Civ. 15.1.

Under rule 15(a), the court should freely grant leave to amend a pleading where justice so requires.  See In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. 571, 579-80 (D.N.M. 2010)(Browning, J.); Youell v. Russell, 2007 WL 709041, at *1-2 (D.N.M. 2007)(Browning, J.); Burleson v. ENMR-Plateau Tele. Coop., 2005 WL 3664299, at *1-2 (D.N.M. 2005)(Browning, J.).  The Supreme Court has stated that, in the absence of an apparent reason such as "undue delay, bad faith or dilatory motive . . . [,] repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.," leave to amend should be freely given.  Fomen v. Davis, 371 U.S. 178, 182 (1962).  See Curley v. Perry, 246 F.3d 1278, 1284 (10th Cir. 2001); In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80.

A court should deny leave to amend under rule 15(a) where the proposed "amendment would be futile."  Jefferson Cnty. Sch. Dist. v. Moody's Investor's Serv., 175 F.3d 848, 859 (10th Cir. 1999).  See In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80.  An amendment is "futile" if the pleading "as amended, would be subject to dismissal."  In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80 (citing TV Commc'ns Network, Inc. v. Turner Network Television, Inc., 964 F.2d 1022, 1028 (10th Cir. 1992)).  A court may also deny leave to amend "upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, [or] failure to cure deficiencies by amendments previously allowed."  In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579 (quoting Frank v. U.S. W., Inc., 3 F.3d 1357, 1365-66 (10th Cir. 1993)).  See Youell v. Russell, 2007 WL 709041, at *2-3 (D.N.M. 2007)(Browning, J.); Lymon v. Aramark Corp., 2009 WL 1299842 (D.N.M. 2009)(Browning, J.).  The Tenth Circuit has also noted:

> It is well settled in this circuit that untimeliness alone is a sufficient reason to deny leave to amend, see Woolsey v. Marion Laboratories, Inc., 934 F.2d 1452,

1462 (10th Cir. 1991); <u>Las Vegas Ice & Cold Storage Co. v. Far West Bank</u>, 893 F.2d 1182, 1185 (10th Cir. 1990); <u>First City Bank v. Air Capitol Aircraft Sales</u>, 820 F.2d 1127, 1133 (10th Cir. 1987), especially when the party filing the motion has no adequate explanation for the delay, <u>Woolsey</u>, 934 F.2d at 1462. Furthermore, "[w]here the party seeking amendment knows or should have known of the facts upon which the proposed amendment is based but fails to include them in the original complaint, the motion to amend is subject to denial." <u>Las Vegas Ice</u>, 893 F.2d at 1185.

<u>Frank v. U.S. W., Inc.</u>, 3 F.3d at 1365-66.[4]  The longer the delay, "the more likely the motion to amend will be denied, as protracted delay, with its attendant burdens on the opponent and the court, is itself a sufficient reason for the court to withhold permission to amend." <u>Minter v. Prime Equip. Co.</u>, 451 F.3d at 1205 (citing <u>Steir v. Girl Scouts of the USA</u>, 383 F.3d 7, 12 (1st Cir. 2004)).  Undue delay occurs where the plaintiff's amendments "make the complaint 'a moving target.'"  <u>Minter v. Prime Equip. Co.</u>, 451 F.3d at 1206 (quoting <u>Viernow v. Euripides Dev. Corp.</u>, 157 F.3d 785, 799-800 (10th Cir. 1998)).  "[P]rejudice to the opposing party need not also be shown."  <u>Las Vegas Ice & Cold Storage Co. v. Far W. Bank</u>, 893 F.2d at 1185. "Where the party seeking amendment knows or should have known of the facts upon which the proposed amendment is based but fails to include them in the original complaint, the motion to amend is subject to denial."  <u>Las Vegas Ice & Cold Storage Co. v. Far W. Bank</u>, 893 F.2d at 1185 (quoting <u>State Distribs., Inc. v. Glenmore  Distilleries Co.</u>, 738 F.2d 405 (10th Cir. 1984)). Along the same vein, the court will deny amendment if the party learned of the facts upon which its proposed amendment is based and nevertheless unreasonably delayed in moving to amend its

---

[4]The Court notes that there is older authority in the Tenth Circuit that seems to be to the contrary.  <u>See</u> <u>R.E.B., Inc. v. Ralston Purina Co.</u>, 525 F.2d 749, 751 (10th Cir. 1975)("Lateness does not of itself justify the denial of the amendment.").  <u>Minter v. Prime Equipment Co.</u> seems to clarify that the distinction is between "delay" and "undue delay."  <u>Minter v. Prime Equipment Co.</u>, 451 F.3d at 1205-06.  Delay is undue "when the party filing the motion has no adequate explanation for the delay." <u>Minter v. Prime Equipment Co.</u>, 451 F.3d at 1206.

Based on 1:15-cv-00654-JB-SCY

complaint.  See Pallottino v. City of Rio Rancho, 31 F.3d 1023, 1027 (10th Cir. 1994)(noting motion to amend filed "was not based on new evidence unavailable at the time of the original filing").

Refusing leave to amend is generally justified only upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment.  See Castleglen, Inc. v. Resolution Trust Corp., 984 F.2d 1571, 1585 (10th Cir. 1993)(citing Foman v. Davis, 371 U.S. at 182). Again, the matter is left to the Court's discretion.  Frank v. U.S. W., Inc., 3 F.3d at 1365-66.  See Duncan v. Manager, Dep't of Safety, City & Cnty. of Denver, 397 F.3d 1300, 1315 (10th Cir. 2005)(quoting Frank v. U.S. West, Inc., 3 F.3d at 1365-66, and stating that resolving the issue whether to allow a plaintiff to file a supplement to his complaint is "well within the discretion of the district court").  "The . . . Tenth Circuit has emphasized that '[t]he purpose of [rule 15(a)] is to provide litigants the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties.'"  B.T. ex rel. G.T. v. Santa Fe Pub. Schs., 2007 WL 1306814, at *2 (D.N.M. 2007)(Browning, J.)(quoting Minter v. Prime Equip. Co., 451 F.3d 1196, 1204 (10th Cir. 2006)).  "Specifically, the . . . Tenth Circuit has determined that district courts should grant leave to amend when doing so would yield a meritorious claim."  Burleson v. ENMR-Plateau Tel. Co-op., 2005 WL 3664299, at *2 (D.N.M. 2005)(Browning, J.)(citing Curley v. Perry, 246 F.3d 1278, 1284 (10th Cir. 2001)).

## ANALYSIS

The Court is faced with two motions: first, a motion to dismiss, in which the United States argues that C. Warren's First Amended Complaint fails to establish the Court's jurisdiction to resolve the case, because the discretionary function exception to the FTCA's

waiver of the United States' sovereign immunity bars all of its claims; and second, a motion to amend the First Amended Complaint, and substitute a proposed Second Amended Complaint, because, although C. Warren contests that the First Amended Complaint fails to state claims under the FTCA as the United States argues, C. Warren suggests that the proposed Second Amended Complaint bolsters her arguments and more specifically alleges why the discretionary function exception does not apply to any of her claims against the BOP.  The United States argues, however, that the Motion to Amend would be futile, because the proposed Second Amended Complaint, like the First Amended Complaint that is the subject of the United States' MTD, fails to satisfactorily state a claim that the discretionary function exception to the FTCA does not bar.  Accordingly, it makes little sense to consider the MTD in a vacuum, because the arguments that the United States makes in its MTD are the same arguments the United States makes in its Motion to Amend Response regarding the proposed Second Amended Complaint's futility.  Indeed, the United States concedes that, should the Court conclude that the proposed Second Amended Complaint states a claim -- or claims -- which escape the discretionary function exception's bar to liability under the FTCA, the Court should grant the Motion to Amend, because the United States has only contested such amendment on futility grounds, and thus raises no additional objections.

The best path forward for the Court, accordingly, is to consider both proffers of fact that C. Warren has alleged in her First Amended Complaint and her proposed Second Amended Complaint.  The arguments the United States makes in its MTD are equally applicable to both inquiries -- those inquiries being whether the First Amended Complaint has stated claims which fall within the United States' waiver of sovereign immunity in the FTCA, and, further, whether the proposed Second Amended Complaint cures any jurisdictional defects in the First Amended

Complaint that the MTD has raised.  If the First Amended Complaint fails to state a FTCA claim, then the Court must grant the MTD the First Amended Complaint.  If the proposed Second Amended Complaint fails to cure any jurisdictional defects, then leave to amend would be futile, and the Court must deny the Motion to Amend.  If the proposed Second Amended Complaint, however, cures one or more jurisdictional defects, then the Court must grant the Motion to Amend, either in whole or in part.  The Court considers the analysis to be so intermingled that the parties are best served by considering the MTD and Motion to Amend in a similarly intermingled fashion, and will proceed accordingly.

The Court, in its independent review of the First Amended Complaint and proposed Second Amended Complaint, agrees with the categorization of C. Warren's claims that the parties subscribed to at the hearing.  At the hearing, the parties each provided to the Court that there were, when whittled down to its core, five categories of allegations the First Amended Complaint and proposed Second Amended Complaint raise.  Those categories are: (i) the BOP's broader duty to protect R. Warren; (ii) the BOP's decision to house R. Warren at Victorville II; (iii) the BOP's placement of Ashley and R. Warren in the same communal holding cell; (iv) the BOP's failure to securely tighten Ashley's waist chain; and (v) the BOP's failure to frequently inspect and supervise the inmate transfer area where the communal holding cell was situated. See Tr. at 4:7-14 (Keegan).  The Court considers this categorization sound and will proceed accordingly.  The Court will begin its analysis with the category of the BOP's alleged broader duty to protect Warren, because, should the Court rule in C. Warren's favor, that category would likely carry her burden to defeat the MTD.  The Court will thereafter address the more specific allegations that C. Warren brings against the BOP, and will consider C. Warren's proffers of statutory or regulatory restrictions on BOP employees' discretion against the backdrop of C.

Warren's continued requests for more extensive discovery.  Ultimately, the Court will grant the United States' MTD, dismiss the First Amended Complaint without prejudice, and deny C. Warren's Motion to Amend, because its filing would be futile on this record.

I.    **THE DISCRETIONARY FUNCTION EXCEPTION TO FTCA LIABILITY IS NOT OVERCOME, WITHOUT MORE, UPON AN ALLEGATION THAT THE BOP FAILED A BROADER DUTY TO PROTECT R. WARREN FROM ASHLEY, A KNOWN WHITE SUPREMACIST WITH A HISTORY OF ASSAULTING OTHER INMATES WITH SEX-OFFENDER STATUS.**

C. Warren first argues that the BOP has a broad duty to protect inmates and that the FTCA's discretionary function exception cannot shield the BOP, which allegedly failed to protect inmates from a known risk, because negligently failing to protect an inmate is not a decision that is susceptible to policy analysis.  C. Warren's arguments do not persuade the Court, however, because such an emphasis on negligent conduct does not comport with Congress' intent underlying the discretionary function exception.  As the Court has explained, the FTCA is a limited waiver of the United States' sovereign immunity, and, indeed, contains several exceptions precluding the United States' liability.  See 28 U.S.C. § 2680.  One of these exceptions is the discretionary function exception, which provides that the FTCA shall not apply to claims "based upon the exercise or performance or the failure to exercise or perform a discretionary-function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).  According to the Supreme Court, § 2680(a) embodies the "boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals."  United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. at 808.  The discretionary function exception, then, must be strictly construed in the United States' favor.  See U.S. Dep't of Energy v. Ohio, 503 U.S. at

615 ("Waivers of immunity must be strictly construed in favor of the sovereign and not enlarged beyond what the language requires.")(internal citations and quotation marks omitted). Its application is a threshold jurisdictional issue in any case brought under the FTCA. See Johnson v. U.S. Dep't of Interior, 949 F.2d at 335.

The Supreme Court has enunciated the two-prong analysis a district court must apply to ascertain whether the FTCA's discretionary-function exception applies. See Berkovitz, 486 U.S. at 536; Domme v. United States, 61 F.3d at 789-90; Black Hills Aviation, Inc. v. United States, 34 F.3d at 972-73; Kiehn v. United States, 984 F.2d at 1102-03. First, the Court must consider whether the acts or omissions are "discretionary in nature, acts that 'involve an element of judgment or choice,'" and thus fall within the language of the exception, or whether they instead involve "a federal statute, regulation, or policy [that] specifically prescribes a course of action for an employee to follow," in which case the exception does not apply. United States v. Gaubert, 499 U.S. at 322 (quoting Berkovitz, 486 U.S. at 536). Second, the conduct -- if discretionary -- must be "based on considerations of public policy." United States v. Gaubert, 499 U.S. at 323 (quoting Berkovitz, 486 U.S. at 537). In applying the Berkovitz analysis, then, the question of negligence is irrelevant: "When the government performs a discretionary function, the exception to the FTCA applies regardless of 'whether or not the discretion involved be abused.'" Redman v. United States, 934 F.2d at 1157 (quoting 28 U.S.C. § 2680(a)).[5]

---

[5]The Tenth Circuit recently reaffirmed this analysis in Garling v. United States Environmental Protection Agency:

> Whether the exception applies depends on the nature of the agency's conduct. *See United States v. Gaubert*, 499 U.S. 315, 322 (1991). To determine whether agency conduct falls within the exception, we apply a two-part test. *See Garcia v. U.S. Air Force*, 533 F.3d 1170, 1176 (10th Cir. 2008)(citing *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)). First, we determine whether the conduct was discretionary -- whether it was "a matter of judgment or choice for the acting employee." *Id.* (quotations omitted). "Conduct is not discretionary if a federal

Here, C. Warren argues that Courts of Appeal have held that "the Government's liability under the FTCA for inmate-on-inmate injuries extends to what BOP staff knew or reasonably should have known regarding a potential threat posed by one inmate towards another." Motion to Amend Reply at 10 (citing <u>Parrott v. United States</u>, 536 F.3d at 637)(internal quotation marks and emphasis omitted). In making this argument, C. Warren relies on the Seventh Circuit's conclusion in <u>Parrott v. United States</u> that a "district court's inquiry should have extended to what BOP officials should have known about the risks of placing the plaintiff together with his assailant," where the district court had, instead, granted summary judgment in favor of BOP officials -- for a failure-to-protect claim brought by an inmate whom another inmate stabbed twenty-two times -- by reasoning "that BOP officials could only be liable if they knew of a potential problem between the two inmates before the assault, as demonstrated by some kind of order." Motion to Amend Reply at 10. According to C. Warren, this interpretation of the duty of care BOP employees owe their inmates, and the duty of care's interaction with the FTCA, has "been adopted by multiple other federal courts, and has not been rejected by the Tenth Circuit." Motion to Amend Reply at 10 (citing <u>Brown v. United States</u>, 486 F.2d at 288-89 (analyzing BOP's liability in a federal prisoner's failure-to-protect suit in terms of what "the federal government knew or reasonably should have known"); <u>Tyree v. United States</u>, 2016 WL 1128486, at *1 ("BOP personnel can only be deemed negligent in violation of [its duty of care]

---

statute, regulation, or policy specifically prescribes a course of action for an employee to follow. In this event, the employee has no rightful option but to adhere to the directive." *Id.* (quotations omitted). Second, if the conduct was discretionary, we consider whether it required the "exercise of judgment based on considerations of public policy." *Id.* If both elements are met, the governmental conduct is protected as a discretionary function, and sovereign immunity bars a claim that involves such conduct. *Id.*

<u>Garling v. United States Environmental Protection Agency</u>, 2017 WL 894432, at *3.

when personnel knew or reasonably should have known of potential problems between inmates."); Jones v. United States, 2012 WL 3777076, at *6-7.

       C. Warren's argument, then, is:

> Indeed, the widespread acknowledgment of the BOP's broader duty of care is of a piece with a larger body of case law which makes it clear that, if the FTCA is to have any application at all, the discretionary function exception cannot swallow the rule. These cases make it clear that every dangerous decision made by federal actors that was not specifically forbidden by written regulation cannot be mechanically rubber-stamped a discretionary act.

Motion to Amend Reply at 11 (citing Soldano v. United States, 453 F.3d at 1150 (holding that the National Park Service's general discretion to design a road did not allow it to disregard "basic, scientific safety specifications" by failing "to set a speed limit consistent with [its] design choices")). Thus, even though there is no "specific directive for employees of a federal agency to keep an open flame away from gasoline," C Warren asserts, should a federal employee choose to light a fire by gasoline, "it would be absurd to dismiss the suit of a citizen injured in the subsequent explosion on account of the discretionary function exception." Motion to Amend Reply at 11 (internal quotation marks omitted). According to C. Warren, that logic suggests that "even if the Government's submissions convince the Court that no specific written order exists in the record that could have saved Mr. Warren's from being tortured to death by Ashley, the Government nevertheless remains liable under the FTCA, for blatantly ignoring ample evidence of the direct threat to Mr. Warren that Ashley posed." Motion to Amend Reply at 12. Such a threat is evidenced, apparently, by Ashley's affiliation with a white supremacist prison gang and his propensity to assault other inmates having sex-offender status. As the Court will explain, such an argument, however, is inconsistent with the Supreme Court's guidance in United States v. Gaubert, 499 U.S. at 322.

Despite C. Warren's reliance on the Seventh Circuit's proposition in Parrott v. United States, which suggested that "Parrott must show only that BOP staff knew or reasonably should have known of a potential problem between the two inmates," the Court is not convinced that that language, in the abstract, is representative of the Seventh Circuit's holding. 536 F.3d at 637. Instead, that case involved a pro se plaintiff, Parrot, and his inability to conduct sufficient discovery, because:

> The Government objected to nearly all of Parrott's discovery motions by asserting that the information he requested was either privileged, or irrelevant, or both. Whether or not those conclusions were accurate, they turned out to be immaterial. In denying Parrott's motions, the district court relied (inappropriately) on rules of admissibility and generalized concerns about privacy and confidentiality, rather than on the basis of discoverability. Once again, a more targeted consideration of the requested materials would have been preferable.

536 F.3d at 638. Parrot had been stabbed multiple times by a former cell mate, with whom he had already had a previous altercation, while the two inmates were engaged in work detail in the kitchen. See 536 F.3d at 632. Parrot thus sued the United States, pursuant to the FTCA, for the BOP's allegedly negligent failure to protect him from a known threat. See 536 F.3d at 636. In support, Parrot pointed to the BOP's duty under 18 U.S.C. § 4042, which requires the BOP to

> (1) have charge of the management and regulation of all Federal penal and correctional institutions; (2) provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States, or held as witnesses or otherwise; and (3) provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States . . . .

18 U.S.C. § 4042(a)(1)-(3). The Seventh Circuit then explained that, "although 'this statute sets forth a mandatory duty of care, it does not, however, direct the manner by which the BOP must fulfill this duty. The statute sets forth no particular conduct the BOP personnel should engage in or avoid while attempting to fulfill their duty to protect inmates.'" 536 F.3d at 637 (quoting

Calderon v. United States, 123 F.3d 947, 950 (7th Cir. 1997)).   The Seventh Circuit next explained, in language that C. Warren has emphasized:

> The district court took the position that Parrott had to show that the correctional officers knew of a potential problem between the two inmates prior to the assault. In fact, the standard is broader: as Parrott argues and the Government concedes, Parrott must show only that BOP staff knew or reasonably should have known of a potential problem between the two inmates.

Parrot v. United States, 536 F.3d at 637.   The balance of the Seventh Circuit's analysis, however, does not indicate that there is, by the FTCA, any potential liability on the part of the BOP for its negligent failure to protect an inmate in general; indeed, in reversing the district court's grant of summary judgment in the BOP's favor, the Seventh Circuit primarily relied upon the existence of a separation order regarding Parrot and his assailant.   See 536 F.3d at 637-38 ("[M]uch of this case hinges on whether a formal separation order existed between Parrot and Gregory.").   The Seventh Circuit thus concluded that the district court had abused its discretion in handling Parrot's motions for discovery regarding this separation order, because "the FTCA's general waiver of sovereign immunity does not apply where the challenged act involves an element of judgment or choice and is susceptible to policy analysis," and "[a]s long as a valid separation order is in effect, there is no discretion left to operate."   536 F.3d at 638, 639.   The Court, accordingly, is not persuaded that Parrot v. United States announces a class of FTCA claims which might be based upon a broader duty to protect inmates, and concludes that Parrot v. United States is instead a routine exploration and application of the FTCA's discretionary-function exception.   The other cases upon which C. Warren asks the Court to rely, so the Court can reach a conclusion that the BOP owes a broad, nondiscretionary duty to protect inmates, and that, thus, certain allegedly negligent conduct may fall outside the purview of the discretionary function exception, all have similar deficiencies.

For example, in <u>Tyree v. United States</u>, where an inmate was attacked and guards did not allegedly respond promptly to an emergency light's activation, the Fourth Circuit reversed a district court's grant of summary judgment in the BOP's favor, because, in part,

> discovery . . . would potentially have created a genuine issue of material fact sufficient to defeat summary judgment.  Accepting Tyree's assertions as true, prison officials did not respond for over five minutes after the emergency light was activated.  The record is devoid of information regarding whether this alleged five minute delay was reasonable.

2016 WL 1128486, at *2.  In fact, the Fourth Circuit explicitly limited its holding, providing: "[W]e express no opinion on the Government's defenses that were not addressed by the district court or the scope of proper discovery[.  W]e find that the district court erred in granting summary judgment based solely on the Government's disputed timeline without permitting discovery."  2016 WL 1128486, at *2.

Similarly, in <u>Jones v. United States</u>, a United States Magistrate Judge for the Northern District of West Virginia recommended that the district court deny the United States' motion to dismiss claims that a BOP inmate -- whom inmates from another pod attacked -- brought.  <u>See</u> 2012 WL 3777076, at *1 (Joel, M.J.).  Magistrate Judge Joel made that recommendation, in part, because, although

> the United States maintains that the plaintiff has not cited any mandatory directives that prescribe a course of action for the circumstances of the incident. . . .  the plaintiff does cite the Correctional Services Procedures Manual in his Opposition to the Defendant's Motion for Partial Dismissal, as well as other directives within his complaint though not by their official citations.  Plaintiff's argument in defense of his lack of citations of mandatory policy is that most of these mandatory directives are in possession of the government and are unavailable in the absence of discovery.

2012 WL 3777076, at *7.  Magistrate Judge Joel further provided, however, that, "[b]ecause the FTCA renders the United States liable for negligently failing to protect a prisoner, negligence, in the opinion of the undersigned, includes failure to respond to a risk which a reasonable person

- 88 -

would have known, whether or not he or she was actually apprised of it."  2012 WL 3777076, at

*7 (making this conclusion after citing Parrot v. United States, 536 F.3d at 637, and explaining

that "although 18 U.S.C. § 4042 sets forth the mandatory duty of care, it does not direct how the

duty is fulfilled. . . .  However, under the FTCA, in disputes between prisoners, it is clear that

BOP employees could be negligent in their duty to protect prisoners if they knew or reasonably

should have known of a potential problem between inmates" (internal quotation marks omitted)).

The Court, again, does not consider this holding to run awry of the FTCA's discretionary

function exception, as it appears to state simply that the BOP owes an undefined duty to protect

inmates from harm and that mandatory policies which, in the discretionary exercise of its

mandate under 18 U.S.C. § 4042, the BOP may have implemented at the relevant facility,

thereby define negligent conduct in light of that duty.  Indeed, in its order adopting Magistrate

Judge Joel's recommendations, the District Judge reiterated that, "[a]t this stage, however, this

Court finds Jones' general allegations sufficient, especially in light of the fact that the policies

and procedures necessary to identify particular citations, should relevant policies and procedures

exist at all, are in the possession of the United States."   Jones v. United States, 2012 WL

3777075, at *4 (N.D.W. Va. 2012)(Bailey, J.), affirming 2012 WL 3777076.

        The Court, accordingly, agrees with the United States' argument that the "discretionary

function exception" applies without regard to whether the "discretion involved was abused or the

product of negligence," and that its application is a "jurisdictional issue which precedes any

negligence analysis."  MTD at 4-5 (citing Elder v. United States, 312 F.3d at 1176; Johnson v.

United States Dept. of Interior, 949 F.2d at 335).  Accordingly, the Court concludes that C.

Warren must establish more than the BOP's abstract negligence at this stage in the proceedings

and, instead, must also first establish that her claims are not based upon actions immunized from

liability under the FTCA's discretionary function exception.  Although 18 U.S.C. § 4042 has

alerted the BOP to the existence of a duty of care it owes to inmates under its control, Congress

has set "forth no particular conduct that the BOP personnel should engage in or avoid while

fulfilling their duty to protect inmates." Calderon v. United States, 123 F.3d at 950.  That is, in

furtherance of its authorization under 18 U.S.C. § 4042, the BOP enjoys the discretion to balance

multiple competing policy interests as it effectuates its broad mandate.  Cf. Calderon v. United

States, 123 F.3d at 950.  The Court will thus not, at this time, accept C. Warren's invitation to

expand the categories of conduct for which Congress has waived the United States' sovereign

immunity.  See Elder v. United States, 312 F.3d at 1176 ("The FTCA waives the federal

government's sovereign immunity for the 'negligent or wrongful act or omission' of a federal

employee "acting within the scope of his office or employment.").  Congress has thus limited the

United States' waiver of sovereign immunity in this regard, by not dictating what is and is not

conduct that falls below the duty of care owed to inmates; the Court thus has no jurisdiction to

undergo an analysis of the allegedly negligent conduct absent a claim that the negligent conduct

occurred in the face of a some mandate limiting the discretion of BOP employees who are acting

in the scope of their employment, or that the negligent conduct -- albeit discretionary -- was not

susceptible to policy analysis.  See Elder v. United States, 312 F.3d at 1176 ("This exception

excludes from the FTCA's waiver of immunity those claims based upon the exercise or

performance or the failure to exercise or perform a discretionary function or duty by a federal

agency or government employee.").  The cases to which C. Warren points further bolster the

Court's conclusion, as the Court is convinced that the dispositive factor in those cases, which

regard allegedly negligent BOP conduct by its failure to protect the plaintiffs, was those

plaintiffs' inability to conduct discovery into the statutes, regulations, or policies that may have

been in effect when the harm occurred, and which may have mandated a specific course of conduct that the BOP officials needed to follow in light of those specific cases' circumstances. The Court thus declines to follow C. Warren's argument for a novel FTCA interpretation, and will maintain at this time the discretionary function exception analysis that the Supreme Court and the Tenth Circuit have mandated.  See Garling v. United States Environmental Protection Agency, 2017 WL 894432, at *3.

The Court next considers the specific allegations that C. Warren makes which rely on mandatory directives that C. Warren contends have removed BOP employees' discretion under certain circumstances.  Unlike the Court's immediately preceding analysis, these allegations deal with specific factual allegations, whereas C. Warren's first argument was primarily a legal argument.  Further discovery would not help C. Warren's argument that the Court expand its discretionary function exception analysis to consider allegedly negligent discretionary conduct in the abstract of some discretion-limiting directive, or conduct that was not grounded in public policy in furtherance of the BOP's authorization; the Court notes, however, that for its analysis of the following categories of allegations, it is cognizant of the role further discovery might play and will credit that notion accordingly.

## II.   THE INITIAL BOP DECISION TO HOUSE R. WARREN AT VICTORVILLE II FALLS WITHIN THE DISCRETIONARY FUNCTION EXCEPTION TO FTCA LIABILITY.

The Court is thus faced with four specific allegations that the relevant BOP officials' conduct violated various mandates, removing the conduct from the purviews of the FTCA's discretionary function exception.  Unlike the generalized allegation of negligence the Court just addressed, C. Warren attempts to make claims premised on the supposed existence of various statutes, regulations, CIM separation assignments, BOP Program Statements, Institutional

Supplements, and/or Post Orders.  Further, regarding these categories of allegations, the Court

must in tandem analyze whether the proposed Second Amended Complaint would be futile or if

it changes significantly the allegations in the First Amended Complaint that is the subject of the

United States' MTD.  The Court will take these categories in turn, as both the First Amended

Complaint and proposed Second Amended Complaint describe them.  The Court will also

consider all the evidence that the parties have given the Court that is not in the pleadings.  The

first category of allegations regards the BOP's initial decision to commit R. Warren to the

facility at Victorville II.

C. Warren first argues that her proposed Second Amended Complaint, in comparison to

the First Amended Complaint, provides further detail regarding how the BOP's designation of R.

Warren to Victorville II, rather than to an institution commensurate with his low-security

classification and program needs, constitute a violation of the FTCA.  See Motion to Amend at

17.  Specifically, the Second Amended Complaint emphasizes:

> While BOP Program Statement 5100.08 authorizes employees of the BOP's
> Designation and Sentence Computation Center (DSCC) to apply a Management
> Variable . . . to an inmate's designation analysis, by which the inmate may be
> placed in an institution level inconsistent with the inmate's security score, the
> BOP's/DSCC's discretion to do so is not unfettered.

Motion to Amend at 17.  BOP Program Statement 5100.08, entitled Inmate Security Designation

and Custody Classification, regards inmate security classification, and explains that BOP inmates

are classified into one of five security levels, namely minimum, low, medium, high and

administrative, with those classifications comporting with institutions as based on the level of

security and staff supervision the institution is able to provide.  See BOP Program Statement

5100.08, at Chapter 1, at 1.  BOP Program Statement 5100.08 gives BOP staff the discretion to

apply "Management Variables" to make inmate designations at institutions which are

inconsistent with their initial security-level classification.  BOP Program Statement 5100.08, at

Chapter 5, at 1.  Population management is such a "Management Variable," and, as C. Warren

explains in her proposed Second Amended Complaint, "BOP was permitted to apply a

Population Management [variable] to Mr. Warren in a situation in which [he] require[d] housing

in a facility which is not commensurate with his . . . security level," but that, regarding that

"Management Variable," the BOP Program Statement 5100.08 offers three example scenarios as

to its applicability: "facility activation; population pressures affecting available appropriate-level

bed space within 500 miles of the inmate's anticipated release residence; [or] gang/security

concerns."  Motion to Amend at 18 (citing BOP Program Statement 5100.08, at Chapter 5, at 3.).

C. Warren therefore argues that the BOP was not exercising its discretion in regard to one of

those scenarios when it designated R. Warren to Victorville II, and that she thus "asserts a

plausible claim that the BOP acted beyond the scope of is discretion in misapplying the

[management variable] to Mr. Warren, and that this misapplication was a proximate cause of his

ultimate death."  Motion to Amend at 18.

Thus, C. Warren is attempting to persuade the Court that the BOP officials violated BOP

Program Statement 5100.08's mandate -- which C. Warren argues removed the BOP's discretion

when making this type of designation determination -- by improperly applying the "Population

Management Variable," further arguing that the BOP improperly applied the "Population

Management Variable," because the example situations that BOP Program Statement 5100.08

illustrates do not, according to C. Warren, encompass R. Warren's designation.  The Court

believes that C. Warren makes this argument, because, as the Supreme Court explained in United

States v. Gaubert:

[I]f a regulation mandates particular conduct, and the employee obeys the
direction, the Government will be protected because the action will be deemed in

furtherance of the policies which led to the promulgation of the regulation.  If the
employee violates the mandatory regulation, there will be no shelter from liability
because there is no room for choice and the action will be contrary to policy.

499 U.S. at 347 (emphasis added).  The Court is not convinced, however, that C. Warren's

reliance on BOP Program Statement 5100.08's example scenarios meets her burden to establish

that BOP's designation of R. Warren was not discretionary conduct under Berkovitz, because

that Program Statement explicitly vests the designation decisions within the BOP's discretion

with respect to the application of management variables regarding the placement of any

particular inmate.  For clarity, 18 U.S.C. § 3621(b) authorizes the BOP to

designate the place of the prisoner's imprisonment.  The Bureau may designate
any available penal or correctional facility that meets minimum standards of
health and habitability established by the Bureau, whether maintained by the
Federal Government or otherwise and whether within or without the judicial
district in which the person was convicted, that the Bureau determines to be
appropriate and suitable, considering --

(1) the resources of the facility contemplated;

(2) the nature and circumstances of the offense;

(3) the history and characteristics of the prisoner;

(4) any statement by the court that imposed the sentence --

(A) concerning the purposes for which the sentence
to imprisonment was determined to be warranted; or

(B) recommending a type of penal or correctional
facility as appropriate; and

(5) any pertinent policy statement issued by the Sentencing
Commission pursuant to section 994(a)(2) of title 28.

18 U.S.C. § 3621(b).  As the United States thus maintains, "placing a management variable on an

inmate is merely a discretionary step within the broader placement decision for that inmate," and

"the decision whether to place a management variable on a particular inmate also falls within the

discretionary function exception."  MTD at 10 (citing <u>Lineberry v. United States</u>, 2009 WL 763052, at *6 ("Likewise, because overcrowding is simply a short-hand way of saying that the BOP placed too many inmates in a particular facility, the alleged act of overcrowding is nothing more than multiple decisions to place inmates at a particular facility -- each of which falls within the discretionary exception.").

Thus, in keeping with the <u>Berkovitz</u> two-pronged analysis, the act of designating an inmate, such as R. Warren, was "discretionary in nature, and . . . 'involve[d] an element of judgment or choice,'" thereby falling within the exception's language, because there is no "federal statute, regulation, or policy [that] specifically prescribes a course of action for an employee to follow," in this specific context.  <u>United States v. Gaubert</u>, 499 U.S. at 322 (quoting <u>Berkovitz</u>, 486 U.S. at 536).  Instead, the BOP has the discretion to make a determination, for population management purposes, to designate an inmate to a facility that is not commensurate with the inmate's security-classification.  <u>Cf.</u> <u>Cohen v. United States</u>, 151 F.3d at 1344 ("Deciding how to classify prisoners and choosing the institution in which to place them are part and parcel of the inherently policy-laden endeavor of maintaining order and preserving security within our nation's prisons.").  As well, the designation and application of "Management Variables" is inherently "based on considerations of public policy."  <u>United States v. Gaubert</u>, 499 U.S. at 323 (quoting <u>Berkovitz</u>, 486 U.S. at 537).  <u>See</u> <u>United States v. Gaubert</u>, 499 U.S. at 325 ("[I]f a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same polices which led to the promulgation of the regulations.").  <u>See also</u> BOP Program Statement 5100.08, at Chapter 5, at 3 ("Situations may occur in which an inmate requires housing in a facility which is not commensurate with his or her security level.").

Accordingly, here, although R. Warren was scored as a low-security inmate, the BOP decided to apply a "Management Variable" and house him at a medium-security facility.   The Court concludes that the BOP's decision was merely an exercise of discretion that both 18 U.S.C. § 3621(b) and BOP Program Statement 5100.08 authorize.   Additionally, the Court is not convinced by, nor can it find any authority in support of, C. Warren's contention that the examples outlined by the provision of the "Population Management Variable" factor in BOP Program Statement 5100.08 constitute an exhaustive set of scenarios for which the BOP may apply the variable.   Instead, the Court concludes that the BOP has the discretion to apply the variable in accordance with the competing interests involved in the policy-laden decision that inmate designation can be.   See Cohen v. United States, 151 F.3d at 1344.

Given the Court's conclusion that the discretionary function exception applies to the BOP officials' conduct in designating R. Warren to a facility that was not commensurate with his security level classification, the Court will grant the MTD with respect to the relevant allegations as premised on this conduct.   The Court, further, in its review of the proposed Second Amended Complaint, does not identify any allegations which provide support to C. Warren's allegations in this category; the First Amended Complaint has not been meaningfully changed in relevant part. Finally, the Court has reviewed all the evidence outside the pleadings that the parties have provided and does not see any support for the contention that the BOP has limited its staffs' discretion and such limitation was violated on this record.   Accordingly, the Court will grant the MTD with respect to this category without addressing the Motion to Amend, because the Motion to Amend would nonetheless be futile.   The Court next turns to C. Warren's category of allegations involving BOP officials' conduct in placing both R. Warren and Ashley in the same communal holding cell before transport to different facilities.

III.   **THE BOP'S DECISION TO PLACE R. WARREN AND ASHLEY IN SAME COMMUNAL HOLDING CELL IN PREPARATION FOR TRANSFER FALLS WITHIN THE DISCRETIONARY FUNCTION EXCEPTION AND THUS DOES NOT, WITHOUT MORE, EXPOSE THE BOP TO FTCA LIABILITY.**

Although the First Amended Complaint alleges that Ashley was one of two persons subject to a CIM Separation Order held by R. Warren, the United States has provided evidence that Ashley was, indeed, not subject to the separation order.   Accordingly, in her proposed Second Amended Complaint, C. Warren concedes that Ashley was not subject to the CIM Separation Order; however, at the hearing, C. Warren restated her argument regarding the existence of a CIM Separation Order to cover the other separation orders that Ashley might have held.   C. Warren argues that, despite that R. Warren did not have a relevant CIM Separation Order, Ashley very well might have, given his history of violence toward sex offenders, been the subject of a separation order involving, broadly, sex offenders or even R. Warren in particular. Accordingly, the First Amended Complaint explains that Ashley "was known to be a highly influential enforcer who controlled white inmates in Victorville II," First Amended Complaint ¶ 114, at 17, and who had violently assaulted at least four inmates convicted of sexual offenses," First Amended Complaint ¶ 115, at 17.   See Second Amended Complaint ¶¶ 115-26, at 18-19 (providing, in part, that Ashley was the subject of multiple CIM Separation Orders regarding other inmates to whom he posed a threat, and that, "[u]pon information and belief, these findings resulted in directives propounded by the BOP and/or Victorville II, mandating that Ashley be kept separate from any inmate to whom he posed a real, significant threat of danger, specifically sex-offender inmates like Mr. Warren").   According to C. Warren, the BOP allegedly mandated that Ashley be segregated from those to whom he posed risks, such as sex-offender status inmates.   See Second Amended Complaint ¶ 126, at 19; id. ¶ 155, at 22; id. ¶¶ 272-73, at 45; id. ¶ 290, at 46.

C.  Warren thus argues that the "BOP officials' conduct in negligently placing Mr. Warren and Ashley together in a communal holding cell" comes in light of alleged separation orders that Ashley held regarding, potentially, inmates like R. Warren, and that although the First Amended Complaint was mistaken in its allegation that Ashley was subject to R. Warren's CIM Separation Order,

> additional discovery will undoubtedly turn up materials mandating that the two inmates be kept separate from one another, that Ashley be separated from the entire class of inmates to which Mr. Warren belongs, i.e., sex offenders, or that Warren be separated from white supremacist inmates as a whole, or from an entire category of inmates (sex offenders or white supremacist inmates) to which the other belonged.

Motion to Amend at 11-12.  C. Warren is correct in arguing that the existence of a separation order mandating that Ashley be separated from R. Warren would, indeed, constitute the type of "federal statute, regulation, or policy [that] specifically prescribes a course of action for an employee to follow" in this context.  United States v. Gaubert, 499 U.S. at 322 (quoting Berkovitz, 486 U.S. at 536).  See  Parrot v. United States, 536 F.3d at 638 ("As long as a valid separation order is in effect, there is no discretion left to operate on that narrow question."); Palay v. United States, 349 F.3d at 431 (concluding that the discretionary function exception does not apply where prison officials have "acted in direct contravention of BOP regulations"). Compare Calderon v. United States, 123 F.3d at 949-50 (concluding that BOP officials' decisions whether to separate inmates are discretionary), with Cohen v. United States, 151 F.3d at 1344-45 (concluding that, even though the decision whether to classify inmates is discretionary, the violation of a mandatory guideline implementing discretionary policies "'will be no shelter from liability because there is no room for choice and the action will be contrary to policy'" (quoting United States v. Gaubert, 499 U.S. at 324)).  C. Warren has only hypothesized as to such a separation order's existence, however, and the Court is left to conclude that the BOP

officials' decision to place both Ashley and C. Warren in the communal holding cell was, under the Berkovitz two-pronged analysis, "discretionary in nature, and . . . 'involve[d] an element of judgment or choice.'"   United States v. Gaubert, 499 U.S. at 322 (quoting Berkovitz v. United States, 486 U.S. at 536).  With respect to the second prong, it is also apparent that the creation of a separation order is inherently "based on considerations of public policy," as such creation regards fact-intensive determinations as to one inmate's threat to another pursuant to the BOP's broad authorization to protect inmates under 18 U.S.C. § 4042.  United States v. Gaubert, 499 U.S. at 323 (quoting Berkovitz, 486 U.S. at 537).  See United States v. Gaubert, 499 U.S. at 325 ("[I]f a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same polices which led to the promulgation of the regulations.").  Here, the relevant BOP officials had the discretion to make the determination to place both R. Warren and Ashley in the same communal holding cell, at least on this record, because no mandate required otherwise.  Cf. Cohen v. United States, 151 F.3d at 1344 ("Deciding how to classify prisoners and choosing the institution in which to place them are part and parcel of the inherently policy-laden endeavor of maintaining order and preserving security within our nation's prisons.").

The Court is persuaded that a separation order concerning Ashley and either R. Warren or the whole class of inmates with sex-offender status at Victorville II would constitute a discretion-removing mandate that may dispel the application of the discretionary function exception.  See Parrot v. United States, 536 F.3d at 638 ("As long as a valid separation order is in effect, there is no discretion left to operate on that narrow question.").  The Court notes, however, that C. Warren has merely hypothesized about such a separation order's existence in both her First Amended Complaint and the proposed Second Amended Complaint.  See First Amended

Complaint ¶ 115, at 17; Second Amended Complaint ¶¶ 115-26, at 18-19; id. ¶ 126, at 19; id. ¶ 155, at 22; id. ¶¶ 272-73, at 45; id. ¶ 290, at 46.   The Court also notes that the United States appears to have agreed, under protective order, to provide C. Warren with the opportunity to discover the nature and extent of any unredacted CIM Separation Orders that the BOP has on file for Ashley.   See Tr. at 30:1-3 (Keegan)("As I you know, maintained from the beginning the United States does not object to plaintiffs' discovery of orders.").   Indeed, the United States maintains that it has already provided C. Warren with the CIM report which indicates any CIM Separation Orders on file for Ashley regarding either R. Warren or a larger class within which R. Warren might fall.   See Tr. at 29:1-4 (Keegan)(discussing an email sent to C. Warren with Ashley's redacted report -- Email from Ruth Keegan to Alicia C. Lopez (dated April 13, 2016), filed September 2, 2016 (Doc. 35-1)).   Because, at this time, neither the First Amended Complaint nor the proposed Second Amended Complaint has sufficiently persuaded the Court as to the existence of such a separation order, the Court must -- at the present time -- grant the United States' MTD as to this category of allegation, and deny the Motion to Amend in relevant part for futility.   Should C. Warren, in her course of agreed-upon discovery with the United States, uncover the existence of such a separation order, then C. Warren may attempt to re-raise her allegation before the Court at that later date.

## IV.   THE BOP'S ALLEGED FAILURE TO SECURELY TIGHTEN ASHLEY'S WAIST CHAIN IS CONDUCT THAT, WITHOUT MORE, FALLS WITHIN THE DISCRETIONARY FUNCTION EXCEPTION.

The First Amended Complaint indicated that Ashley, in the course of his attack on R. Warren, was able to accomplish the attack, because "[t]he correctional officers at Victorville USP had so loosely shackled Ashley's waist chain [that] Ashley was able to lower the waist chain towards the floor and step out of the restraint."   First Amended Complaint ¶ 181, at 26.

The proposed Second Amended Complaint further suggests that the BOP failed to secure Ashley's waist chain, in contravention of "BOP Program Statements, Institutional Supplements, and/or Post Orders propounded by the institution."  Second Amended Complaint ¶ 179, at 27. See id. ¶ 322, at 41 (discussing the loose waist chain).  Were there some mandatory obligation restraining BOP officials' discretion with respect to the tightness of waist chain restraints, the Court would be in a position to consider that obligation against the backdrop of the case's facts. To the best of the Court's knowledge, however, C. Warren's allegation is based only upon the fact that the waist chain was loose enough for Ashley to remove it before he attacked R. Warren. C. Warren has not identified any other authority which dictates how waist chains must be used in BOP facilities.  Instead, C. Warren generally argues that, because the BOP has made the decision to mechanically restrain inmates, it should be done in a fashion that ensures the restraints cannot be slipped.  See Tr. at 57:25-58:4 (Lowry)("The Government has made a decision to apply restraints to people[.  O]nce its made that decision I don't think, it's nondiscretionary[.  T]hey need to be applied appropriately so that person's safety threat is neutralized.").[6]

Accordingly, the Court concludes that C. Warren has not made the requisite showing under the first prong of the Berkowitz analysis; that is, she has not, in this context, identified the type of "federal statute, regulation, or policy [that] specifically prescribes a course of action for an employee to follow" and makes the application of such restraints nondiscretionary.  United States v. Gaubert, 499 U.S. at 322 (quoting Berkovitz, 486 U.S. at 536).  Regarding the second prong, it is also apparent that the application of restraints is inherently "based on considerations of public policy," as such application will regard fact-intensive, individual determinations,

---

[6]Referencing the Davis Aff. and the Eber Aff., wherein both Davis and Eber imply that there are relevant mandates which require certain restraints for high-security inmates, and also arguing that C. Warren will need more discovery to decipher which restraint mandates may or may not have been in effect for Ashley at the time of the attack.  See Tr. at 56:13-25 (Lowry).

pursuant to the BOP's broad authorization under 18 U.S.C. § 4042.  United States v. Gaubert, 499 U.S. at 323 (quoting Berkovitz, 486 U.S. at 537).  Further, even assuming that there is some mandate requiring, generally, that waist chains be used for inmates such as Ashley, C. Warren is incorrect in arguing that the misapplication of the waist chain in this instance would open the BOP up to FTCA liability.  The Court considers the application of restraints to be a delicate policy-balancing act involving considerations of the individual prisoner and the specific circumstances requiring the prisoner's restraint, similar to the discretionary decisions the BOP must make when designating inmates to particular facilities and placing inmates in cells with other inmates.  See Lopez v. United States, 376 F.3d 1055, at 1060-61 ("Rather, when the relevant law leaves room for officials to exercise policy-oriented discretion in a particular area, that discretion will be protected even with regard to what may seem to be details of implementation.")(emphasis added).  See also United States v. Gaubert, 499 U.S. at 325 ("[I]f a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same polices which led to the promulgation of the regulations.").  Cf. Cohen v. United States, 151 F.3d at 1344 ("Deciding how to classify prisoners and choosing the institution in which to place them are part and parcel of the inherently policy-laden endeavor of maintaining order and preserving security within our nation's prisons.").  The Court has, on one occasion, had the United States Marshal put it in the black box restraint mechanism so that it would know how it feels.  The Court has had such devices loosened for certain defendants in the past because of age and health.  In other words, there are a host of reasons -- comfort, length of time in chains, length of arms -- that might cause a BOP officer to loosen the chains in accordance with individual prisoners' needs.  If there were some mandate that Ashley needed to be restrained in chains, the

Court would also make the reasonable inference that he needed to be securely and properly chained and restrained.  Without such a mandate, there is a lot of discretion, unless there is a specific mandate regarding how a person is to be chained if chained at all.  The current record is devoid, however, of either category of mandate.

The Court, thus, will grant the MTD as to this category of C. Warren's allegations in the First Amended Complaint.  Further, because the proposed Second Amended Complaint adds only that, given the fact that Ashley could slip his waist chains, there was likely a violation of "BOP Program Statements, Institutional Supplements, and/or Post Orders propounded by the institution," the Court will also deny the Motion to Amend in this respect for futility.  Second Amended Complaint ¶ 179, at 27.  See id. ¶ 322, at 41.  The proposed Second Amended Complaint does not meaningfully and successfully change C. Warren's allegations in this respect.  The Court notes, however, that, at the hearing, the United States and C. Warren agreed to engage in a discovery colloquy, in which the United States is willing to give C. Warren all Program Statements, Institutional Supplements, and Post Orders which were in effect at Victorville at the time of the incident.  See Tr. at 30:1-3 (Keegan).  The United States stated:

> You know one thing in the briefing . . . is that we were not forthcoming enough with post orders and I don't remember -- program statements and institutional supplements.  I don't have any problem sharing that, some of it, would . . . need to be pursuant to a protect[ive] order and filed under seal.  As I you know, [I] maintained from the beginning the United States does not object to plaintiffs' discovery of orders.

Tr. at 30:1-3 (Keegan).  Should C. Warren make any discoveries of some mandate which required a more specific and less discretionary method of restraining inmates, she may re-raise the issue before the Court at that later date.

V.    **THE BOP'S FAILURE TO DISCOVER THE ASSAULT IN PROGRESS DOES NOT FLOW FROM CONDUCT THAT DOES NOT FALL UNDER THE FTCA'S DISCRETIONARY FUNCTION EXCEPTION.**

C. Warren, for this category of allegations surrounding the BOP staff's failure to supervise the communal holding cell wherein Ashley killed R. Warren, argues that "the Court cannot conclude as a matter of law that USP Victorville staff's decision not to monitor the holding cell in which Ashley and Mr. Warren were placed -- or to ensure Ashley's shackles were secured once inside -- were discretionary," at least "without the benefit of additional discovery into" the relevant local BOP Victorville policies.  Motion to Amend at 13.  See Second Amended Complaint ¶ 187, at 28; id. ¶ 322, at 41 (alleging, further, that the BOP failed to attend the communal holding cell in contravention of "BOP Program Statements, Institutional Supplements, and/or Post orders").  In support of her argument, C. Warren explains that in Keller v. United States, 811 F.3d at 1025, the Seventh Circuit

> considered significant a BOP Program Statement requiring staff to "develop local procedures to clear inmates with a PSY ALERT assignment" to the plaintiff's claim that BOP staff had failed to consider his entire medical profile before releasing him into the general prison population.  Since "[t]hose procedures [were] not in the record the panel [could not] conclude as a matter of law that they did not constrain [the staffer's] discretion to place Keller in the general population."

Motion to Amend at 13-14 (quoting Keller v. United States, 811 F.3d at 1025).  Thus C. Warren requests that the Court follow the Seventh Circuit's guidance and not grant the United States' MTD without first "knowing the content of local directives," which are applicable to the Court's application of the "first prong of the discretionary function exception."  Motion to Amend at 14. Accordingly, C. Warren contends that "the Court cannot determine whether local directives granted USP Victorville staff 'room for choice' in supervising the [inmate transfer] area. . . . Nor can the Court determine whether BOP staff failed to comply with those directives, in such a

fashion that their negligence would not be shielded by the discretionary function."  Motion to

Amend at 14 (quoting United States v. Gaubert, 499 U.S. at 324).  In this case, C. Warren

contends that "there remains the distinct possibility that institutional policies possibly removed

that discretion from Victorville II staff members by mandating a course of conduct in supervising

the [inmate transfer] area" and that thus the United States cannot simply "invoke the protection

of the discretionary function exception now, without more in the record, by arguing that its

general statutory discretion grants it *carte blanche* discretion in all other decisions."  Motion to

Amend at 15 (citing Boyd v. United States, 881 F.2d 895, 898 (10th Cir. 1989)).  The Court

notes that the United States has agreed to provide that discovery, however, in full and under

protective order, to C. Warren.  See Tr. at 30:1-3 (Keegan)("[W]ith post orders and . . . program

statements and institutional supplements . . . I don't have any problem sharing that, some of it,

would . . . need to be pursuant to a protect[ive] order and filed under seal . . . the United States

does not object to plaintiffs' discovery of orders.").

      C. Warren next proffers, however, as an example of the First Amended Complaint's

relevant allegations, that she has alleged that the "BOP Program Statement 5100.08 mandated,

among other things, that [s]ecurity inspections are necessary to . . . ensure the security, safety,

and good order of the institution; [a]ll areas must be regularly inspected and [s]taff frequently

inspect all areas in [the inmate transfer area] accessible to inmates."  Motion to Amend at 15

(discussing BOP Program Statement 5100.08; the Court notes, however, that, in its review of the

record, the correct Program Statement is likely BOP Program Statement 5100.12, because the

language the Motion to Amend references appears to be exclusively from BOP Program

Statement 5100.12).  Accordingly, C. Warren argues that R. Warren's death is evidence that the

communal holding cell was not frequently inspected as BOP Program Statement 5100.12 at

Chapter 1, at 8, allegedly requires.  <u>See</u> Motion to Amend at 15-16.  C. Warren thus requests that the Court deny the United States' MTD, because the discretionary function exception cannot thereby apply.  Motion to Amend at 15-16.  C. Warren argues further that BOP Program Statement 5800.12 also requires: "All areas must be regularly inspected. . . .  Holding cells should be situated so that staff have visual contact at all times."  Motion to Amend Reply at 8 (citing BOP Program Statement 5800.12 at Chapter 1, Page 8).

For clarity, BOP Program Statement 5800.12, in relevant part regarding the Receiving and Discharge -- that is, inmate transfer -- area, provides:

> Security inspections are necessary to control the introduction of contraband, prevent escapes and ensure the security, safety, and good order of the institution.
>
> The R&D area must provide adequate holding cells for the volume and types of inmates processed through the institution.  <u>All areas must be regularly inspected.</u> Inspections must also be made prior to and following each occasion an inmate(s) is placed in the holding cells.  Windows should be screened to deter the introduction of contraband.  No areas holding inmates should contain false ceilings or loose furniture.  <u>Holding cells should be situated so that staff have visual contact at all times.</u>  <u>If the physical plant prevents such visual contact, other alternatives such as mirrors or camera equipment should be used.</u>  Camps are exempted from having holding cells, provided they have areas designated to separate searched and unsearched inmates, and are able to maintain order and security in processing/discharging inmates.  Holding cells in camps are also exempted from the false ceiling requirement.
>
> <u>Frequent inspections of all areas in R&D accessible to inmates must be conducted.</u>  Inspections should be done at various times so as not to set a definite pattern.  Such inspections are designed to detect contraband, prevent escapes, maintain sanitation standards, and eliminate fire and safety hazards.

BOP Program Statement 5800.12 at Chapter 1, Page 8 (emphasis added to highlight the language which C. Warren primarily identifies in support of her argument).  Thus, looking to the <u>Berkowitz v. United States</u> factors, first, C. Warren argues that the BOP's conduct -- in failing to discover the assault in a timely manner -- falls within the discretionary function exception's language, because, in this context, "a federal statute, regulation, or policy specifically prescribes

a course of action for an employee to follow." United States v. Gaubert, 499 U.S. at 322

(quoting Berkovitz, 486 U.S. at 536).  Under BOP Program Statement 5100.12, the BOP officials

must have "visual contact" with the communal holding cell at "all times" and also "regularly

inspect[]" the communal holding cells.  BOP Program Statement 5800.12 at Chapter 1, Page 8.

C. Warren contends that, because R. Warren was the subject of a prolonged assault, there was

not visual contact at all times or a regular inspection of the communal holding cell.  See 67:19-

71:17 (Lowry).  The Court considers this argument initially deficient, however,  because C.

Warren has not argued that such a violation of the Program Statement has occurred -- the BOP

officials very well might have had visual contact of the holding cell at all time, and very well

might have made frequent and regular inspections; in fact, they ultimately discovered the assault.

The Court, first, can dispose of C. Warren's inspection argument, because, although there is a

requirement to do as much, the use of the discretion-laden terms "regular" or "frequent" suggest

"the relevant [mandate] leaves room for officials to exercise policy-oriented discretion in a

particular area," and "that discretion will be protected even with regard to what may seem to be

details of implementation."  Lopez v. United States, 376 F.3d at 1060-61.

As to C. Warren's argument regarding the visual contact that BOP Program Statement

5800.12 at Chapter 1, Page 8, mandates, the Court notes that C. Warren conceded at the hearing

that "[n]o, there was no specific allegation about line of sight.  What we said was the holding cell

was unattended," as evidenced by the failure to witness the assault, which was allegedly caused

by the failure of visual contact with the cell.  It is at this point that C. Warren's argument, as

presently alleged, must fail, because she has not identified, in this context, "a federal statute,

regulation, or policy [that] specifically prescribes a course of action for an employee to follow,".

United States v. Gaubert, 499 U.S. at 322 (quoting Berkovitz, 486 U.S. at 536).  The Court

wonders, for example, whether a BOP official tasked with maintaining "visual contact" of the communal holding cell from, say, a guard tower, is also tasked with maintaining visual contact with multiple facilities at Victorville.  Also, the BOP officials, perhaps, carry out the requirement for having "visual contact" by camera, and the BOP officials are thus tasked with watching footage of multiple facilities at one time.  The Court also notes that, at the hearing, C. Warren appears to have conceded that something more -- some other mandate, regarding the Court's quandaries, or another implementation of BOP Program Statement 5800.12 at Chapter 1, Page 8 -- is needed to make a satisfactory showing under Berkovitz, 486 U.S. at 536.  See Tr. at 64:20-22 (involving a colloquy between the Court and C. Warren, where, after the Court asked whether it was a "manning the spot" problem that C. Warren is alleging, as opposed to a physical layout problem as the BOP Program Statement 5800.12 plainly addresses, C. Warren stated: "Right. And that's what we talked between throughout the course of trying to get discovery, post orders that kind of thing.").  Regarding the second prong's application, then, to the BOP officials' discretionary conduct in overseeing its premises, it is also apparent that such conduct is inherently "based on considerations of public policy," as such conduct will regard fact-intensive, facility-by-facility determinations, pursuant to the BOP's broad authorization under 18 U.S.C. § 4042.  United States v. Gaubert, 499 U.S. at 323 (quoting Berkovitz, 486 U.S. at 537).  The Court thus concludes that C. Warren has not identified in either her First Amended Complaint or the proposed Second Amended Complaint, the requisite mandate to dispel the discretionary function exception's application.  The Court is cognizant of the discovery that C. Warren seeks regarding the relevant BOP mandates covering this category of allegations, and notes that the United States and C. Warren agreed to the disclosure of any and all BOP Program Statements, Institutional Supplements, and Post Orders.  See Tr. at 30:1-3 (Keegan)("[W]ith post orders and .

. . program statements and institutional supplements . . . I don't have any problem sharing that, some of it, would . . . need to be pursuant to a protect[ive] order and filed under seal. . . the United States does not object to plaintiffs' discovery of orders.").  Given the record as it stands -- absent supplement -- the Court will grant the United States' MTD as to this category of allegations and deny the Motion to Amend, because granting the Motion to Amend would be futile given its lack of additional allegations regarding any operative BOP mandates.  Should C. Warren make any discoveries of a relevant mandate, however, she may re-raise the issue before the Court at that later date.   As to this point, in sum, the Court reiterates what it said at the hearing:

> Can you send me a letter one of you saying this was what was provided so I know what is out there, if you don't supplement the record I assume there wasn't anything there helpful to you.  So I'll at least have a letter when I'm putting the opinion together[.  I will] know what the holes are[,] what you're not getting if you want to tell me[,] what you asked for and didn't get it, help me keep that in mind.

Tr. at 77:23-78:6 (Court).

**IT IS ORDERED** that: (i) the Defendant's Motion to Dismiss for Lack of Jurisdiction and Memorandum in Support, filed February 9, 2016 (Doc. 14)("MTD"), is granted; (ii) the requests in Plaintiff Carol Warren's Joint Response to the United States' *Motion to Dismiss for Lack of Jurisdiction and Memorandum in Support* (Doc. 14) and Motion for Leave to Amend the Complaint, filed August 16, 2016 (Doc. 33)("Motion to Amend"), are denied; and (iii) C. Warren's First Amended Complaint, filed September 30, 2015 (Doc. 4), is dismissed without prejudice.  The Court will, however, give Plaintiff Carol Warren the opportunity to supplement her record with evidence that the Defendant United States provides, and file a motion for leave to file an amended complaint should her discovery colloquy with the United States provide her with the requisite mandates that the Court has identified she needs to move forward with her case.

- 109 -

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Marc M. Lowry
Alicia Consuelo Lopez
Rothstein Donatelli, L.L.P.
Albuquerque, New Mexico

      *Attorneys for the Plaintiffs*

Damon P. Martinez
  United States Attorney
Ruth Fuess Keegan
  Assistant United States Attorney
Albuquerque, New Mexico

      *Attorneys for the Defendant*